**Stephen KING, Plaintiff–Appellee,**

v.

**INNOVATION BOOKS, A DIVISION OF INNOVATIVE CORPORATION, Defendant,**

**Allied Vision, Ltd., New Line Cinema Corporation, Defendants– Appellants.**

**Nos. 2169, 2170, Dockets 92–7713, 92–7731.**

United States Court of Appeals, Second Circuit.

Argued Aug. 10, 1992.

Decided Oct. 1, 1992.

James P. Clark, New York City (Wesley G. Howell, Jr., Robert F. Serio, Mary Lee Wegner, Colleen D. Duffy, Gibson, Dunn & Crutcher, of counsel), for defendant-appellant Allied Vision, Ltd.

Joseph J. Santora, New York City (Michael S. Allen, Santora & Allen, of counsel), for defendant-appellant New Line Cinema Corp.

Paul R. Levenson, New York City (Peter A. Herbert, Sheri L. Rosenfeld, Alasdair J. McMullan, Cowan, Liebowitz & Latman, P.C., of counsel), for plaintiff-appellee.

Before: WINTER, MINER and McLAUGHLIN, Circuit Judges.

MINER, Circuit Judge:

Defendants-appellants, Allied Vision, Ltd. and New Line Cinema Corporation, appeal from an order of the United States District Court for the Southern District of New York (Motley, *J.*) granting a preliminary injunction in favor of plaintiff-appellee Stephen King in connection with King's claims under the Lanham Act and New York law. King, who is the author of such best-selling horror thrillers as *The Shining, Carrie* and *Salem's Lot,* contended that Allied and New Line falsely designated him as the originator of the motion picture "The Lawnmower Man," which was produced by Allied and distributed in North America by New Line. The injunction, which prohibits any use of King's name "on or in connection with" the movie, encompasses two forms of credit to which King objected: (i) a possessory credit, describing the movie as "Stephen King's The Lawnmower Man," and (ii) a "based upon" credit, representing that the movie is "based upon" a short story by King. For the reasons that follow, we affirm the district court's order to the extent that it prohibits use of the possessory credit, but reverse the order to the extent that it prohibits use of the "based upon" credit.

## BACKGROUND

In 1970, King wrote a short story entitled "The Lawnmower Man" (the "Short Story"). The Short Story, published in 1975 and running about ten printed pages in length, involves Harold Parkette, a homeowner in the suburbs. Parkette begins to neglect his lawn after an incident in which the boy who usually mows his lawn mows over a cat. By the time Parkette focuses his attention again on his overgrown lawn, the boy has gone away to college. Parkette therefore hires a new man to mow his lawn. The lawnmower man turns out to be a cleft-footed, obese and vile agent of the pagan god Pan. The lawnmower man also is able to move the lawnmower psychokinetically—that is, by sheer force of mind.

After starting the lawnmower, the lawnmower man removes his clothing and crawls after the running mower on his hands and knees, eating both grass and a mole that the mower has run over. Parkette, who is watching in horror, phones the police. Using his psychokinetic powers, however, the lawnmower man directs the lawnmower after Parkette, who is chopped up by the lawnmower's blades after being chased through his house. The Short Story ends with the discovery by the police of Parkette's entrails in the birdbath behind the home.

In 1978, King assigned to Great Fantastic Picture Corporation the motion picture and television rights for the Short Story. The assignment agreement, which provided that it was to be governed by the laws of England, allowed the assignee the "exclusive right to deal with the [Short Story] as [it] may think fit," including the rights

(i) to write film treatments [and] scripts and other dialogue versions of all descriptions of the [Short Story] and at all times to add to[,] take from[,] use[,] alter[,] adapt ... and change the [Short Story] and the title[,] characters[,] plot[,] theme[,] dialogue[,] sequences and situations thereof. . . .

(ii) to make or produce films of all kinds ... incorporating or based upon the [Short Story] or any part or parts thereof or any adaptation thereof.

In return, King received an interest in the profits of "each" film "based upon" the Short Story.

In February 1990, Great Fantastic transferred its rights under the assignment agreement to Allied, a movie production company organized under the laws of the United Kingdom and having offices in London. In May 1990, Allied commissioned a screenplay for a feature-length film entitled "The Lawnmower Man." The screenplay was completed by August 1990, and pre-production work on the movie began in January 1991. By February 1991, Allied began to market the forthcoming movie by placing advertisements in trade magazines and journals. The picture generally was described as "Stephen King's The Lawnmower Man," and as "based upon" a short story by King. Actual filming of the movie

began in May 1991. About one month later, Allied, through its United States subsidiary, licensed New Line, a domestic corporation with offices in New York and California, to distribute the movie in North America. The licensing agreement was concluded in California, and a press release announcing the distribution deal was issued from that state as well. New Line initially paid $250,000 for the distribution rights, with an additional $2.25 million to be paid thereafter.

King learned of the forthcoming movie in early October 1991, from an article in a film magazine. He then contacted Rand Holston, an agent handling King's film rights, in an attempt to gather information about the film; asked Chuck Verrill, his literary agent, to obtain a "rough cut" of the movie; and instructed Jay Kramer, his lawyer, to inform Allied that King did not like the idea of a possessory credit (a form of credit apparently portended by the article).

By letter dated October 9, 1991, Kramer advised Allied that King "d[id] not want" a possessory credit to appear on the film. Kramer also requested a copy of the movie and the tentative movie credits King was to receive. In another letter to Allied dated October 21, 1991—written after Kramer secured a copy of the movie's screenplay—Kramer advised that "we emphatically object" to the possessory credit contained in the screenplay, and noted that he had yet to receive a copy of the tentative credits.

It appears that King learned of New Line's involvement with the film in November 1991. On King's direction, Verrill contacted New Line for a copy of the film. Verrill was informed that a copy would not be available until January 1992. Verrill contacted New Line again on February 6, 1992, but this produced no copy of the film either. Kramer and Holston shortly advised New Line, in a February 18, 1992 telephone call with New Line's President of Production Sara Risher, that King was "outraged" that the movie was being described as "Stephen King's The Lawnmower Man."

In a February 28, 1992 letter, Kramer again insisted to Risher that the possessory credit was a "complete misrepresentation," and attached copies of the October 1991 letters sent to Allied. As of this time, New Line had paid the balance of the price due to Allied for purchase of the distribution rights, had expended about $7.5 million in advertising and marketing costs, and had become committed to release the movie in theaters throughout North America.

On March 3, 1992—four days or so before release of the movie in theaters—King viewed a copy of the movie in a screening arranged by Allied and New Line. The protagonist of the two hour movie is Dr. Lawrence Angelo. Experimenting with chimpanzees, Dr. Angelo develops a technology, based on computer simulation, known as "Virtual Reality," which allows a chimp to enter a three-dimensional computer environment simulating various action scenarios. Dr. Angelo hopes to adapt the technology for human use, with the ultimate goal of accelerating and improving human intelligence.

Eventually, Dr. Angelo begins experimenting with his technology on Jobe, who mows lawns in Dr. Angelo's neighborhood and is referred to as "the lawnmower man." Jobe, a normal-looking young man, is simple and possesses a childlike mentality. Dr. Angelo is able greatly to increase Jobe's intellect with Virtual Reality technology. However, the experiment spins out of control, with Jobe becoming hostile and violent as his intelligence and mental abilities become super-human. In the build-up to the movie's climax, Jobe employs his newly acquired psychokinetic powers to chase Dr. Angelo's neighbor (a man named Harold Parkette) through his house with a running lawnmower, and to kill him. The police discover the dead man's remains in the birdbath behind his home, and, in the climax of the movie, Dr. Angelo destroys Jobe.

The film and advertising seen by King contained both possessory and "based upon" credits. On the evening of March 3, after viewing the film, King wrote to Holston:

I think *The Lawnmower Man* is really an extraordinary piece of work, at least visually, and the core of my story, such as it is, is in the movie. I think it is going to be very successful and I want to get out of the way. I want you to make clear to [the] trolls at New Line Pictures that I am unhappy with them, but I am shelving* any ideas of taking out ads in the trades or trying to obtain an injunction to stop New Line from advertising or exploiting the picture. I would like to talk to you late this week or early next about doing some brief interviews which will make my lack of involvement clear, but for the time being, I am just going to step back and shut up.

---

* At least for the time being.

In a March 23, 1992 letter, Kramer again advised Allied of King's "long standing objection" to the possessory credit, and also took note of "the apparent failure of [Allied] to inform New Line of Mr. King's objection until the movie was about to be released." However, no objection to the "based upon" credit ever was registered until May 20, 1992. From March through May 1992, New Line expended another $2.5 million in promotion and entered into certain hotel movie and television commitments, as well as home video arrangements.

King initiated the instant suit on May 28, 1992, seeking damages as well as injunctive relief. He claimed that the possessory and "based upon" credits violated section 43(a) of the Lanham Act, *see* 15 U.S.C. § 1125(a), as well as the New York common law of unfair competition and contracts, the New York General Business Law, and the New York Civil Rights Law. A motion for preliminary injunction was made on June 3, and a hearing was held on June 29.

The district court agreed with King on all of his claims and granted the injunction on July 2, concluding that the possessory credit was false on its face, that the "based upon" credit was misleading, and that the irreparable harm element of a preliminary injunction action had been satisfied. The equitable defenses of laches, estoppel and waiver interposed by Allied and New Line were rejected.

The injunction prohibited use of King's name "on or in connection with" the motion picture, and by its terms encompassed both the possessory and "based upon" credits. The injunction applied to distribution of the film by Allied abroad as well as by New Line in North America, either in theaters or on videocassette or on television. We granted appellants' application for a stay pending this expedited appeal, but conditioned the stay upon suspension of use of the possessory credit. At oral argument, counsel for New Line informed us that the videocassettes of the movie now in circulation contain only the "based upon" credit.

## DISCUSSION

■ We review a district court's issuance of a preliminary injunction for abuse of discretion. *Carew-Reid v. MTA*, 903 F.2d 914, 916 (2d Cir.1990) (citations omitted). Such an abuse of discretion ordinarily consists of either applying an incorrect legal standard or relying on a clearly erroneous finding of fact. *Procter & Gamble Co. v. Chesebrough-Pond's Inc.*, 747 F.2d 114, 118 (2d Cir.1984) (citation omitted). As the district court observed, a party such as King seeking an injunction "must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward [that] party...." *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991); *Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 314-15 (2d Cir.1982).

### I. Likelihood of Success on the Merits

■ The district court correctly noted that a false reference to the origin of a work, or a reference which, while not literally false, is misleading or likely to confuse, may form the basis of a claim under section 43(a) of the Lanham Act. *See* 15 U.S.C. § 1125(a) (1988) (prohibiting use in commerce of "any false designation of origin, false or misleading description of fact,

or false or misleading representation of fact" which is "likely to cause confusion ... or to deceive as to [ ] affiliation, connection, or association"); *Gilliam v. American Broadcasting Companies, Inc.*, 538 F.2d 14, 24–25 (2d Cir.1976).

### A. *The Possessory Credit*

■ We perceive no error in the district court's conclusion that King is likely to succeed on the merits of his objection to the possessory credit. The district court was entirely entitled to conclude, from the testimony at the preliminary injunction hearing, that a possessory credit ordinarily is given to the producer, director or writer of the film; and that the credit at a minimum refers to an individual who had some involvement in, and/or gave approval to, the screenplay or movie itself. In contrast to other films for which he has been given a possessory credit, King had no involvement in, and gave no approval of, "The Lawnmower Man" screenplay or movie.

Under the circumstances, therefore, the arguments advanced by Allied and New Line as to why the possessory credit is not false—that the other movie credits make clear that King was not the producer, director or writer of the film, and that King has in the past received a possessory credit where he merely approved in advance of the screenplay or movie—do not alter the conclusion that King is likely to succeed on his challenge to the possessory credit. Appellants also contend that King offered no evidence of public confusion in relation to the possessory credit. As will be detailed in our discussion of irreparable harm, however, there was some such evidence offered. In any event, as the district court recognized, no evidence of public confusion is required where, as is the case with the possessory credit, the attribution is false on its face. *See PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 272 (2d Cir.1987) (citations omitted).

### B. *The "Based Upon" Credit*

As the district court recognized, a "based upon" credit by definition affords more "leeway" than a possessory credit. The district court nevertheless concluded that the "based upon" credit at issue here is misleading and likely to cause confusion to the public, reasoning in essence that the "climatic scene from the [S]hort [S]tory is inserted into the film in a manner wholly unrelated to the plot of the film," and that the credit "grossly exaggerates" the relationship between the Short Story and the film. While particular findings of fact are subject to the clearly erroneous standard of review, we have said that the weighing of factors in "the ultimate determination of the likelihood of confusion is a legal issue subject to *de novo* appellate review." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 75–76 (2d Cir.1988) (citations omitted) (Lanham Act trade mark claim). We believe that in so heavily weighing the proportion of the film attributable to the Short Story in the course of finding the "based upon" credit to be misleading and confusing, the district court applied a standard without sufficient support in the testimony and applicable law.

John Breglio, an attorney of the law firm of Paul, Weiss, Rifkind, Wharton & Garrison specializing in entertainment law, testified as an expert witness for King. Breglio opined that the term "based upon," in the context of royalty obligations under King's assignment agreement, was not identical to the term "based upon" in a movie credit. After speaking of a test of "substantial similarity" between the literary work and movie, and opining that there was not substantial similarity between the Short Story and the film, Breglio went on to state that the industry standard for determining the meaning of a "based upon" movie credit is very similar to that used by copyright lawyers in examining issues of copyright infringement. Breglio further explained that this standard involved looking "at the work as a whole and how much protected material *from the underlying work* appears in the derivative work." (emphasis added)

■ Indeed, in cases of alleged copyright infringement it has long been appropriate to examine the quantitative and qualitative degree to which the allegedly infringed

work has been borrowed from, and not simply the proportion of the allegedly *infringing* work that is made up of the copyrighted material. *See Harper & Row v. Nation Enterprises,* 471 U.S. 539, 565–66, 105 S.Ct. 2218, 2233, 85 L.Ed.2d 588 (1985) (citing *Sheldon v. Metro–Goldwyn Pictures Corp.,* 81 F.2d 49, 56 (2d Cir.) (L. Hand, *J.*), *cert. denied,* 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936)). Accordingly, the propriety of the "based upon" credit should have been evaluated with less emphasis on the proportion of the film attributable to the Short Story, and with more emphasis on the proportion, in quantitative and qualitative terms, of the Short Story appearing in the film. Where a movie draws in material respects from a literary work, both quantitatively and qualitatively, a "based upon" credit should not be viewed as misleading absent persuasive countervailing facts and circumstances. Our concern is the possibility that under the district court's apparent approach, substantially all of a literary work could be taken for use in a film and, if unrelated ideas, themes and scenes are tacked on or around the extracted work, a "based upon" credit would be deemed misleading.

■ In the case before us, the apparent "core" of the ten page Short Story—a scene in which a character called "the lawnmower man" uses psychokinetic powers to chase another character through his house with a running lawnmower and thereby kill him—is used in the movie. In both the movie and the Short Story, the remains of the murdered man (who is named Harold Parkette in both works) are found in the birdbath by the police; the two police officers in both works have the same names and engage in substantially similar dialogue. As King himself described it, "the core of my story, such as it is, is in the movie." The red lawnmower seen in the movie also appears to be as described in the Short Story. A brief reference to the Pan mythology of the Short Story appears in the movie as well; dialogue between Jobe and another character includes a reference to "Pan pipes of the little people in the grass."

We recognize that several important and entertaining aspects of the Short Story were not used in the film, and that conversely the film contains a number of elements not to be found in the Short Story. However, when the resemblances between the Short Story and the motion picture at issue here are considered together, they establish to our satisfaction that the movie draws in sufficiently material respects on the Short Story in both qualitative and quantitative aspects.

Nor are there any persuasive countervailing facts or circumstances in the record to lead us away from the conclusion that the "based upon" credit is proper in this case. King himself apparently was not bothered much (if at all) by the "based upon" credit, in marked contrast to his sustained and strong objections to the possessory credit, until shortly before he initiated this suit. He has not pointed us to evidence in the record of industry or public perception of, or confusion over, the "based upon" credit beyond the thoughts offered by Breglio. Professor George Stade, Vice Chairman of the English Department at Columbia University and King's other expert witness, did opine that, despite similarities, the movie was not based upon the Short Story. However, even Professor Stade indicated at one point in his testimony that "substantial" portions of the Short Story appear in the film.

In *Gilliam v. American Broadcasting Companies, Inc.,* 538 F.2d 14 (2d Cir.1976), we found a violation of section 43(a) by the ABC television network, which had aired, under license from the BBC, the "Monty Python's Flying Circus" programs of the British comedy group. Monty Python's agreement with the BBC gave the comedy group substantial control over any editing by the BBC. *See id.* at 17. However, ABC on its own substantially edited the programs it aired under the BBC license, so as to eliminate many thematically essential and humorous portions of the original programs. *See id.* at 24–25 & n. 12. King suggests, in disputing the legitimacy of the "based upon" credit, that Allied's treatment of the Short Story is analogous to ABC's editing in *Gilliam.*

However, at issue in *Gilliam* were original Monty Python programs which were edited by ABC and then rebroadcast as Monty Python's work. We specifically noted that Monty Python was being "present[ed] to the public as the creator of a work not [its] own, and [made] subject to criticism for work [it] has not done." *Id.* at 24 (quotation omitted). While *Gilliam* certainly supports the view we have taken of the possessory credit, the case is not very helpful in evaluating the accuracy of a "based upon" credit, which by definition deals with altered and derivative works.

It is undoubtedly the case that King's assignment agreement does not permit Allied to use King's name fraudulently, and we express no view as to the degree of overlap between the term "based upon" in the King assignment agreement and the term "based upon" in a theatrical credit. However, we do note that the agreement contemplates substantial alterations to the Short Story, and even obligates Allied to give King credit in the case of a film "based wholly or substantially upon" the Short Story. We think that King would have cause to complain if he were *not* afforded the "based upon" credit.

## II. Irreparable Harm

█ As the district court observed, a presumption of irreparable harm arises in Lanham Act cases once the plaintiff establishes likelihood of success on a claim of literal falseness, as King has established with respect to the possessory credit. *See McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1548–49 (2d Cir.1991) (citation omitted); *cf. Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,* 794 F.2d 38, 41–42 (2d Cir.1986) (except in "rare cases," irreparable harm "almost inevitably" follows from likelihood of confusion). Nothing in the record persuades us that the district court erred in concluding that this presumption was not rebutted.

Appellants contend that any presumption of irreparable injury was rebutted because King delayed in seeking relief. However, the greatest conceivable delay attributable to King is about eight months: from early October 1991, when he first learned of the movie, to early June 1992, when he moved for a preliminary injunction. During that time, however, King, through his agents, contacted Allied and New Line and repeatedly objected to any use of a possessory credit, and attempted to obtain the screenplay, tentative credits and film for viewing. This is not conduct that undercuts a sense of urgency or of an imminent threat, and indeed the circumstances in this case contrast with those in which we have found a delay negating the presumption of irreparable harm.

In *Citibank, N.A. v. Citytrust,* 756 F.2d 273 (2d Cir.1985), for example, we held that an irreparable harm presumption was negated where New York's Citibank delayed bringing suit for nine months after having notice that Connecticut's Citytrust intended to open a branch in the New York area. We pointed out that Citibank made no effort to verify the opening of Citytrust's branch, made no objection concerning the branch, and had made no real objection to Citytrust's advertising in New York media markets in past years. *See id.* at 276–77; *see also Majorica, S.A. v. R.H. Macy & Co.,* 762 F.2d 7, 8 (2d Cir.1985) (per curiam) (irreparable harm negated where plaintiff delayed for "several years" in bringing trade name suit despite awareness of competitor's allegedly infringing conduct, made no complaint to competitor during that time, and did not move for preliminary injunction until seven months after suit filed). Also to be considered is that a great deal of King's alleged delay was attributable to problems in acquiring a copy of the film from appellants. *See Horgan v. MacMillan, Inc.,* 789 F.2d 157, 164 (2d Cir.1986) (expressing doubt that plaintiff delayed unduly in seeking preliminary injunctive relief where only "general intentions" of alleged copyright infringer were known and plaintiff had trouble obtaining advance copy of alleged infringer's work).

The March 3 letter written by King to Rand Holston, in which King indicated that he was impressed by the movie and that he was "shelving" legal action, together with apparently similar remarks made by King

to counsel at that time, could be viewed as countering an irreparable harm presumption. However, the district court did not accept this argument, and we are unable to find error in this under all the circumstances. While King refers in the letter to shelving action against New Line's advertising of the picture, King does not say in the letter that he is shelving action against Allied or action in relation to the credits appearing in the movie itself. Further, because of the references in the letter to "at least for the time being" and "at this time," King's reactions as of March 3 could be viewed as tentative in nature. Indeed, shortly after King's March 3 letter was written, Kramer again wrote to Allied to reiterate King's "long standing objection" to the movie's possessory credit.

█ Appellants also suggest that the presumption of irreparable harm was rebutted because King himself enjoyed the movie, continues to be a popular literary figure, and was unable to specify particular financial injury. However, we have observed that the irreparable harm in cases such as this often flows not so much from some specific reduction "in fact" to an individual's name or reputation, but rather from the wrongful attribution to the individual, in the eye of the general public, of responsibility for actions over which he or she has no control. *See Church of Scientology*, 794 F.2d at 44 (citation omitted); *see also Gilliam*, 538 F.2d at 25 (irreparable harm where through substantial editing ABC "impaired the integrity of [Monty Python's] work and represented to the public as the product of [Monty Python] what was actually a mere caricature of [its] talents").

In this connection, King testified to the obvious point that his name and artistic reputation are his major assets, and offered into evidence certain unfavorable reviews of the movie. These reviews tended to discuss the movie in possessory terms and portray the work as a kind of failure on the part of King personally—persuasive evidence of the type of damage and confusion caused by the possessory credit. One reviewer, for instance, who thought the movie uninspiring, commented sarcastically: "Coming next week to a theater near you: *Stephen King's Grocery List*." Another review began with the statement that "Steven [sic] King's latest film, *The Lawnmower Man*, continues to reinforce the impression that he and Hollywood just don't work well together."

## III. Laches

█ A party asserting the equitable defense of laches must establish both plaintiff's unreasonable lack of diligence under the circumstances in initiating an action, as well as prejudice from such a delay. *See Southside Fair Housing Committee v. City of New York*, 928 F.2d 1336, 1354 (2d Cir.1991) (citation omitted); *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 592 F.2d 651, 655 & n. 4 (2d Cir.1978). The district court used March 3, 1992—the date King viewed the film—as the baseline from which to evaluate the laches question in this case. The district court concluded, using this date, that a mere three month delay in bringing suit was not unreasonable, and that prejudice also was absent because appellants had entered into the great majority of their commitments in connection with the movie by March 3. According to Allied and New Line, however, King knew everything he needed to know to assert his rights by October 1991, when a copy of the screenplay (with credits) was obtained. Appellants argue, therefore, that October 1991 is the proper time from which to consider the laches question, and note that many commitments were made, and much money expended, after that time.

█ The issue of laches is committed to the discretion of the district court, *see Dickey v. Alcoa Steamship Co.*, 641 F.2d 81, 82 (2d Cir.1981) (citations omitted), and we see no abuse of that discretion here. King could not be certain about what the film would contain—the film credits lying at the heart of this dispute—until he actually viewed a copy of the film. Indeed, in the very same letter of October 21 in which he acknowledged having the screenplay, Kramer specifically complained that he had not yet seen the tentative film credits. Accordingly, October 1991 does not seem to

us to be a useful date at which to draw a baseline. *See Gilliam*, 538 F.2d at 18, 25 (Monty Python group feared in early September that programs could be edited by television network, and first of programs so edited aired in early October; but no laches where the group did not actually see tape of the edited program until late November, objected to network promptly thereafter, and commenced suit after discussions failed); *see also Horgan*, 789 F.2d at 164.

Even if the October 1991 date were to be used, we would not be willing to say that King unreasonably delayed in initiating this suit, in light of his conduct and the history of the parties prior to commencement of the suit. As mentioned previously, King objected to the possessory credit to Allied as soon as he learned of the film in October 1991. He attempted at that time to obtain the screenplay, tentative credits, and a copy of the movie. He continued to voice his objections to what seemed planned by appellants and attempted to become fully informed and resolve the matter. Even taking into account the March 3 letter to Holston, King did not encourage or acquiesce in the use of a possessory credit. *Compare Southside Fair Housing*, 928 F.2d at 1355 (14 month delay in bringing suit; laches established where plaintiffs either supported actions later sued upon or "essentially stood mute" in "protracted silence").

New Line argues that while King may have objected to Allied in a timely fashion, King did not make his objections known to New Line itself until much later, in February 1992. However, it seems that Allied—the actual producer of the movie and the licensor of New Line—was the appropriate party to contact. New Line itself appears to have been of this same view, as evidenced by an internal New Line memorandum. The memo, written by Sara Risher to Sandra Ruch, another New Line executive, recorded the contents of the February 18 telephone call during which King's agents complained to New Line of the possessory credit. Risher told the agents that "this was a problem [King] should have dealt with the producers [Allied] on and that the

producers represented to us we had this right."

The district court also found that appellants together delayed King's viewing of the film. This finding was supported by the evidence. A January 17, 1992 letter from Peter McRae of Allied to Sandra Ruch, for example, indicated that any "approach" to King had to be "carefully considered" in light of "the potential benefits we may gain." Ruch handwrote on this letter that "[w]e don't want S King to see it [the movie] before opening date." This kind of "unclean hands" behavior confirms our belief that there was no abuse of discretion in the district court's rejection of the equitable defense of laches.

## IV. New York Law and Jurisdictional Claims

We have considered the various New York law claims made by King and accepted by the district court, and have concluded that the results we reach in this case under the Lanham Act are the same under the applicable New York law. We have also considered appellants' remaining arguments—including the contention that this case should be assigned to another judge and Allied's claim that the district court was without jurisdiction to enjoin foreign distribution of the movie—and found them to be without merit.

## CONCLUSION

The order of the district court granting a preliminary injunction is affirmed to the extent it prohibits use of the possessory credit, but reversed to the extent it prohibits use of a "based upon" credit.