**MIRAMAX FILMS CORP., Plaintiff,**

v.

**COLUMBIA PICTURES ENTERTAIN-
MENT, INC., and Mandalay Enter-
tainment, Inc., Defendants.**

No. 97 CIV. 7657(MGC).

United States District Court,
S.D. New York.

March 5, 1998.

Gold, Farrell & Marks, New York, NY by Alan R. Friedman, Paul V. LiCalsi, Howard W. Weller, for Plaintiff.

Rosenman & Colin LLP, New York, NY by Lauren Reiter Brody, Frances K. Browne, Judith Z. Katz, Devjani Mishra, for Defendants.

## OPINION AND ORDER

CEDARBAUM, District Judge.

Miramax Films Corp. sues Columbia Pictures Entertainment, Inc., and Mandalay Entertainment, Inc., for unfair competition under Section 43(a) of the Lanham Act, for common law unfair competition, and for trademark infringement.

Plaintiff moves preliminarily to enjoin defendants from conducting an allegedly false and misleading advertising campaign for the motion picture "I Know What You Did Last Summer" (hereafter "Summer"), which defendants produced and are distributing throughout the world. Plaintiff complains that defendants' advertising campaign falsely designates "Summer" as originating from the same "creator" as the motion picture "Scream," a motion picture that plaintiff developed and distributed. Plaintiff's grievance is that defendants are seeking to profit from the popularity of "Scream" by inducing potential viewers of horror movies to patronize "Summer" in the false belief that it originated from the same source as "Scream" and is associated with "Scream." Defendants oppose plaintiff's motion on the ground that plaintiff has failed to establish that the advertisements are misleading and has failed to show irreparable harm. For the reasons discussed below, plaintiff's motion for a preliminary injunction is granted.

*Controlling Principles of Law*

■ A preliminary injunction may issue only when the movant demonstrates (a) irreparable harm and (b) either (i) a likelihood of success on the merits of the claim, or (ii) sufficiently serious questions going to the merits of the claim to make it fair ground for litigation, and the balance of the hardships tips decidedly in favor of the movant. *SEG Sports Corp. v. State Athletic Commission,* 952 F.Supp. 202, 204 (S.D.N.Y.1997).

■ A higher standard applies when an injunction will alter, rather than maintain, the *status quo.* *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33–34 (2d Cir.1995). Such an injunction should issue only upon a clear showing that the moving party is entitled to the relief requested. *Id.* at 34.

Under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (hereafter "the Lanham Act"):

Any person who, on or in connection with any goods ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods ...

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged.

15 U.S.C. § 1125(a)(1)(A).

■ False advertising is actionable under the Lanham Act both for an advertisement that is literally false and for a literally true advertisement which is likely to mislead or confuse customers. The deceptive representation must materially affect consumers' purchasing decisions. *National Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841, 855 (2d Cir.1997). A misleading reference to the origin of a work may also form the basis of a claim under the Lanham Act. *See King v.*

*Innovation Books,* 976 F.2d 824, 828–29 (2d Cir.1992).

### The Facts

On December 18, 1997, I conducted a hearing on plaintiff's application for a preliminary injunction. I have examined the affidavits submitted by both sides, weighed the oral testimony and the credibility of the witnesses, studied the exhibits received in evidence, and considered all prior submissions regarding this matter, and I make the findings of fact that follow.

Plaintiff is an international developer and distributor of motion pictures. In December 1996, plaintiff released for distribution in the United States the motion picture "Scream," a film of the "horror movie" genre. "Scream" was directed by Wes Craven, an internationally renowned director of horror movies, including the film "Nightmare on Elm Street."

In an attempt to exploit Wes Craven's fame, plaintiff aggressively marketed "Scream" as a Wes Craven product, both in the United States and abroad. For example, promotional materials referred to the film as "The Highly Acclaimed New Thriller From Wes Craven" and "Wes Craven's Scream" (Gill Aff., Ex. B). As explained by plaintiff's chairman of worldwide film distribution Richard Sands, plaintiff views Wes Craven as "a director that I protect and I use as a commodity" (Tr. 50). Numerous film critics in the United States and the United Kingdom have identified Wes Craven as the creative force behind "Scream" (Tr. 35, Pl.Ex. 4; Gill Aff., Ex. C).

By any measure, "Scream" was an extraordinary success. In addition to being praised by film critics, "Scream" grossed over $100 million at the box office domestically, and, as of December 18, 1997, had grossed approximately $65 million overseas. In the United Kingdom, as of December 18, 1997, "Scream" had grossed $13.5 million at the box office, making it the highest grossing horror movie ever shown in the United Kingdom (Tr. 36, 107). Because of the extraordinary success of the film, plaintiff is planning a merchandising campaign associated with the film, and expects to produce clothing, accessories, and games under the "Scream" label. As of December 18, 1997, "Scream" was still in box office release in the United Kingdom, and it continues to proceed through the various stages of "ancillary" distribution, home video rental, home video sale, pay-per-view, pay cable, and free television in the United States and the United Kingdom.

On October 17, 1997, defendants, producers and distributors of motion pictures, released "Summer" in the United States. Shortly before October 17, 1997, plaintiff discovered that defendants were marketing "Summer" as "From the Creator of Scream." The marketing campaign preceding the release of "Summer" described the film, in television, radio, and newspaper advertisements, as being "From the Creator of 'Scream,'" and with such lines as "Last Time He Made you Scream, This Time You Won't Have the Chance" and "From the Creator of 'Scream' Comes a New Chapter in Terror." These advertisements (hereafter "'Scream' catchphrases") dominate the written portions of both the television and print advertisements. In the print advertisements, "From the Creator of Scream" is the headline in large print. At one juncture in the television advertisement shown both in the United States and the United Kingdom, the screen fills with the phrase "From the creator of Scream," with a voice-over stating the same information, but without naming the creator.

The only link between "Scream" and "Summer" is the screenwriter Kevin Williamson. Williamson wrote an original screenplay for "Scream," and adapted a novel by Lois Duncan for the screenplay of "Summer." In the television and print advertisements, Williamson's name appears in the small-print "credit block" as the screenwriter of "Summer," but he is never named or otherwise identified as the "creator" to whom the advertisements refer.

In two affidavits in support of plaintiff's position, Williamson himself describes as "quite different" his roles with respect to each of the films. He does not consider himself to be the "creator" of "Summer." Williamson affirms that Wes Craven is the person most reasonably perceived to be the "creator" of "Scream" (Williamson Aff., Octo-

ber 15, 1997, ¶¶ 2–3; Williamson Aff., October 16, 1997, ¶¶ 2, 4).

Defendants first showed Williamson a promotional poster for "Summer" in the late summer of 1997. Williamson "immediately" indicated to defendants that "people [will] take this as a reference to Wes Craven," but defendants told Williamson that "the public will not be confused because we will do everything necessary to eliminate any confusion and we will make it clear we are referring to you." Williamson does not identify the spokesmen for defendants who made these representations. Williamson also "complained" about defendants' television commercials to defendant Mandalay's president Adam Platnick and senior executive Jason Blumenthal, although he does not specify when this complaint was made (Williamson Aff., October 15, 1997 ¶ 4; Williamson Aff., October 16, 1997 ¶ 2).

Prior to the release of "Summer," on October 15, 1997, plaintiff commenced this lawsuit and moved for a temporary restraining order and preliminary injunction against defendants' "From the creator of 'Scream'" advertising campaign.

The hearing on the first preliminary injunction motion was held on October 16, 1997, and continued to October 20, 1997. On October 20, 1997, defendants voluntarily withdrew the campaign in the United States, and represented to me that "Summer" was "not being released now" in foreign markets (October 20, 1997, Tr. 6). In open court on October 20, 1997, the following colloquy was recorded. Ms. Brody is counsel for defendants, and Mr. Friedman is counsel for plaintiff:

[the Court]: What else [contains] "From the Creator of Scream" that has not been disclosed to date?

[Ms. Brody]: That may be an overstatement, has not been disclosed.

[the Court]: Let's not quibble about words, that I don't know about.

[Ms. Brody]: We do not control Movie Phone; that is a separate corporation, a separate entity, which sells tickets to the public.

[the Court]: You don't give them a description of the film, is that correct?

[Ms. Brody]: We may give them information about the film.

[the Court]: I understand. I need an affidavit from your client that you did not advise Movie Phone that the movie is from the creator of Scream. If you did, I direct that you advise Movie Phone to remove it. I think you should advise them in any event to remove it.

It is in everybody's interest that this proceeding come to an end. Removing "From the Creator of Scream," which as far as I can tell doesn't really cause you much difficulty, from every place that you have caused it to be used would resolve this entire proceeding.

[Ms. Brody]: I really cannot give you any more instances w[h]ere it might appear.

[the Court]: I think you really have to cross-examine your client about that. I need to be promptly advised whether there is anyplace else that your client has issued or advised or promoted the use of the expression "From the Creator of Scream."

The alternative is to make sure all such references are removed, which I take it is what you are now engaged in doing, but it should be done promptly if you are interested in resolving this lawsuit.

[Ms. Brody]: I will consult with my client and I will report back to the court.

[the Court]: I would like to know today.

[Ms. Brody]: OK.

[Mr. Friedman]: Your Honor, I am sure included in that is they will check about international exportation.

[the Court]: I don't know anything about that. What about it?

[Mr. Friedman]: Their film is not going to be confined—

[the Court]: This is being released in some other country as well at the same time?

[Ms. Brody]: Not at the same time; it's not being released now.

[the Court]: I am sure your client is not so foolhardy. You are not going to use the same promotional materials, whatever they are, for any future release. I don't know

what it sounds like in French or Spanish; it may not be[] as compelling.

[Mr. Friedman]: There is something I feel I should say in light of the comments you have made. We are looking very closely at our damages claim in this case. While this will resolve this proceeding with respect to injunctive relief at the outset, it won't resolve it as to further proceedings that can be held in the case.

[the Court]: Everybody has to do as advised. Off the record.

(Discussion off the record)

[Mr. Friedman]: There will be a telephone call to your Honor's chambers today that will state whether or not that phrase, "From the Creator of Scream," is being used.

[the Court]: I would rather have it in the form of a fax, you now have my fax number which you will destroy after this proceeding, because I would like it in writing. You will get a copy, I will get a copy, and I will see what [is] being said.

[Ms. Brody]: Would you reiterate what you would like from us this afternoon.

[the Court]: Yes. I would like to know if there is any other promotional material in connection with this film, that is, "I Know What You Did Last Summer," [t]hat was either released by your client, encouraged by your client, that came from the lips or pen of anybody from representing your client, that uses the expression, "From the Creator of Scream."

(Tr. 4–7). Various communications were subsequently received from defendants, but none made any reference to any foreign distribution of the film or the use of the disputed promotional materials.

Although they did not disclose that fact to the plaintiff or the court, defendants had already released the disputed advertising material to distributors around the world. Defendants continued to release the materials until November 10, 1997. Moreover, newly created materials—materials without the disputed catchphrases—were sent out only to those foreign distributors who explicitly requested them (Tr. 146–48, 194).

On December 11, 1997, plaintiff returned to court seeking a preliminary injunction to enjoin the foreign promotion. Plaintiff had recently learned that defendants were releasing "Summer" in the United Kingdom on December 12, 1997, and were promoting "Summer" in the United Kingdom by using the same materials that defendants had voluntarily withdrawn in the United States. Also on December 12, 1997, plaintiff released "Scream 2," the sequel to "Scream," in the United States. That film grossed $39 million in its first weekend of release.

At the time of plaintiff's second motion for a preliminary injunction, defendants disclosed a memorandum written by defendant Mandalay's general counsel on October 28, 1997. This memorandum had been sent to Summit Entertainment, the firm that oversees defendants' activities with their foreign distributors, but had not been sent by defendants to foreign distributors (Tr. 142). The memorandum advised that there was a pending lawsuit, withdrew the "warranties" of the promotional materials which defendants had provided, but did not even recommend that the disputed materials be recalled (Tr. 141, Pl.Ex. 10, Nollette Mem. at 1–2).

As part of their contract with foreign distributors of "Summer," defendants are obligated to provide promotional and advertising materials (Tr. 132). Defendants contend that once the material is delivered, they lose control over its subsequent use; however, defendants now concede that they have the power to disapprove any advertisements which deviate from the materials sent by them to their distributors (Tr. 134, 138). Additionally, according to the Standard Terms and Conditions agreement between defendants and EFD, their United Kingdom distributor, "If requested by Mandalay, EFD will submit all Advertising Materials to be used by EFD in the exercise of any Rights hereunder for Mandalay's Approval" (Tr. 134; Nollette Aff., Ex. B, Standard Terms and Conditions, at 10 ¶ 3.6[a]).

On December 15, 1997, I issued a temporary restraining order pending the hearing on the preliminary injunction motion scheduled for December 18, 1997. That order was stayed by the Court of Appeals pending the

hearing scheduled for December 18, 1997. The hearing was held on December 18, 1997.

At the hearing, plaintiff presented a consumer survey designed by Dr. Jerry Wind, a professor at the Wharton School of the University of Pennsylvania, and conducted by Data Development Corporation (Wind Decl. ¶¶ 1, 3, Ex. A–1). To the extent indicated below, I accept certain findings of the consumer survey as accurate and reliable.

The survey involved two studies. The first (hereafter "first study") is a study of consumers who saw "Summer" during its opening weekend of October 17, 1997. This survey was conducted between October 26, 1997 and November 4, 1997. The second (hereafter "second study") is a study of consumers standing in line waiting to view "Summer" between October 31, 1997 and November 6, 1997. Both surveys were directed to fifteen to forty year olds in the top 180 motion picture markets of the United States (Wind Decl., Ex. A–1, at 2–4).

According to the first study, 17% of those answering openended questions thought that the advertising for "Summer" communicated that "Summer" was the sequel to "Scream," that the creator of "Summer" produced "Scream," that the creator of "Summer" directed "Scream," or that the creator of "Summer" was Wes Craven (Wind Decl., Ex. A–1, Sections 1, 2, at 14). Only 2% of those responding to open-ended questions thought that the advertising for "Summer" communicated that "Summer" was by the writer of "Scream" or by Kevin Williamson (Wind Decl., Ex. A–1, Section 4, at 14).

According to the second study, 20% of those answering openended questions thought that the advertising for "Summer" communicated that "Summer" was the sequel to "Scream," that the creator of "Summer" produced "Scream," that the creator of "Summer" directed "Scream," or that the creator of "Summer" was Wes Craven (Wind Decl., Ex. A–1, Sections 1, 2, at 24). Only 1% of those responding to open-ended questions thought that the advertising for "Summer" communicated that "Summer" was by the writer of "Scream" or by Kevin Williamson (Wind Decl., Ex. A–1, Section 4, at 24).

I credit Wind's testimony that the advertisements are likely to have a similar impact in the United Kingdom (Tr. 325–26) and that the similarity of results between the first and second studies indicates the reliability of those results (Tr. 325–26).

Finally, while I credit the anecdotal evidence of consumer confusion presented by plaintiff through various affidavits and exhibits, my finding of confusion is based primarily on the consumer surveys. It is supported by defendants' persistent use of the "Scream" catchphrases to promote their film.

### Discussion

This case is not easy to pigeon-hole. It is clearly a false advertising case because the misleading words appear in advertisements and promotional materials. Additionally, because the advertisements identify the origin of "Summer" with the origin of "Scream," cases involving false designation of origin and false endorsement provide valuable analogies. Finally, regardless of whether plaintiff is correct that it owns a trademark in "Scream," the fact that defendants' advertisements identify source makes trademark law analogous as well.

#### Likelihood of Success

Plaintiff is likely to succeed on its claim that the "Scream" catchphrases are misleading and are likely to mislead potential viewers of horror films to believe that "Summer" comes from the same source as "Scream."

First, plaintiff has shown that an appreciable number of consumers hold false beliefs as to the connection between the two films. *See Johnson & Johnson\*Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir.1992) (in false advertising claim involving "implied falsehood" rather than literal falsehood, initial question is whether an appreciable number of consumers hold the false belief allegedly communicated by the advertisement). Virtually no consumers discerned from the advertisements the only accurate link between the films, namely that Williamson wrote both screenplays. By contrast, 17% of those in the first study and 20% of those in the

second study perceived a specific creative link which was false. *Cf. Kraft General Foods, Inc. v. Friendship Dairies, Inc.,* 1991 WL 149755, 19 U.S.P.Q.2d 1691, 1694 (S.D.N.Y.1991) (in trade dress claim, finding confusion source rate of 17% to be "convincing evidence that an appreciable number" of targeted consumers were likely to be confused as to the source and origin of the product).

Second, plaintiff has established that the advertising campaign is the source of the consumer confusion. *See Johnson & Johnson,* 960 F.2d at 298 (stating that once the meaning to the target audience has been determined, the court must judge whether the evidence establishes that consumers are likely to be misled by the advertisement). Defendants' advertisements are likely to confuse because they fail to name Kevin Williamson, or the writer of the movie script, as the only link between "Scream" and "Summer." Defendants could easily have advised the public that the screenwriter of "Summer" and "Scream" was the same person. Instead, defendants' advertisements imply that the films are more closely related.

*Irreparable Harm*

■ This is a case in which irreparable harm may be presumed. Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation. *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 37 (2d Cir.1995). Irreparable harm is closely associated with damages which are difficult to quantify. For example, in the context of a claim of loss of prospective good will, the Second Circuit has noted the "general proposition" that irreparable harms exists "only where there is a threatened imminent loss that will be very difficult to quantify at trial." *Tom Doherty,* 60 F.3d at 38. *Tom Doherty* teaches that in a case in which damages will be difficult to quantify, the court must be aware of the potential unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at trial with the rule that damages must be based on more than speculation. *Tom Doherty,* 60 F.3d at 38.

■ This case presents plaintiff with the same general obstacle noted by the Court in *Tom Doherty.* "Scream" and "Scream 2" are both extraordinary successes. Sands testified, for example, that measuring only opening weekend sales, "Scream 2" was the twelfth highest grossing movie of all time (Tr. 52). It is difficult to imagine that plaintiff will be able to prove what the gross for "Scream 2" would have been in the absence of defendants' advertising campaign for "Summer" two months before the release of "Scream 2." *Cf. Camp Beverly Hills, Inc. v. Camp Central Park, Inc.,* 1982 WL 51046, 217 U.S.P.Q. 783, 786 n. 13 (S.D.N.Y.1982) (in trademark case, showing by defendant that plaintiff's sales have increased over the relevant period does not rebut showing of irreparable harm; "valid inference" could be drawn that plaintiff would have earned more had defendants not infringed the trademark).

Similarly, Sands testified that defendants' advertising campaign will increase the cost of plaintiff's future distribution efforts, and that it has reduced, and will continue to reduce, the value of the ancillary distribution rights for both "Scream" and "Scream 2." Again, quantitative proof will be difficult if not impossible to find in these areas.

As noted, plaintiff's claim is analogous to three types of Lanham Act claims in which irreparable harm has been presumed if the plaintiff establishes likelihood of success on the merits, namely false advertising, false designation of origin, and false endorsement. *Cf. McNeilab, Inc. v. American Home Products Corp.,* 848 F.2d 34, 38 (2d Cir.1988) (misleading comparative advertisement directed at specific competing product); *King v. Innovation Books,* 976 F.2d 824, 831 (2d Cir.1992) (literally false designation of the origin of a work); *Allen v. National Video, Inc.,* 610 F.Supp. 612, 630 (S.D.N.Y.1985) (false endorsement).

For the purpose of evaluating irreparable harm, the case most analogous to this case is *King.* In *King,* the defendant entitled its motion picture, and advertised it as, "Stephen King's The Lawnmower Man," a designation of origin which was literally false because King had no involvement in, and had

not approved, the screenplay or the movie. *King,* 976 F.2d at 828–29.

Those facts warranted a presumption of irreparable harm. *See King,* 976 F.2d at 832 ("irreparable harm in cases such as this often flows not so much from some specific reduction 'in fact' to an individual's name or reputation, but rather from the wrongful attribution to the individual in the eye of the general public, of responsibility for actions over which he or she has no control"). *Accord Allen,* 610 F.Supp. at 617–18, 625–26, 630 (irreparable harm presumed since objectionable advertisement depicted look-alike of celebrity plaintiff endorsing defendants' product; celebrity's "drawing power" depends upon the good will of the public). The harm which presumptively faced King and Allen is present here, namely the wrongful attribution of responsibility for a movie over which plaintiff has no control and the potential for loss of reputation with the public.

The fact that the designation of origin in *King* was literally false, whereas the designation here is misleading, does not diminish the likelihood that plaintiff has been harmed; nor does the fact that in both *King* and *Allen* the designation was to a named person, whereas here it is to the more ambiguous "creator" of "Scream." The fact that the false designation in *King* was literally false and referred by name to Stephen King is relevant to the determination of whether the designation was "likely to cause confusion" within the meaning of 15 U.S.C. § 1125(a)(1)(A). *Cf. King,* 976 F.2d at 829 (affirming district court's conclusion that King was likely to succeed on the merits of his objection to the possessory credit even though King had arguably presented insufficient evidence of public confusion; "no evidence of public confusion is required where, as is the case with the possessory credit, the attribution is false on its face"). Although plaintiff cannot rely on the presumption of confusion which would be available in a case of literal falseness such as *King,* plaintiff has affirmatively demonstrated that defendants' advertisements have confused consumers in the relevant market about the source of "Summer." The type of harm which flows from this confusion does not depend on whether the confusion results from a literally false designation of origin as opposed to a "misleading" designation of origin. While a literally false designation might, depending on the circumstances of any given case, be presumed to cause a greater *degree* of harm, it is the type of harm—not its degree—that permits the reviewing court to presume irreparable injury.

Defendants do not even attempt to distinguish *King.* Defendants do briefly argue that *Allen* is inapposite because defendants' advertisements do not "give[] the impression" that a specific person or entity, namely plaintiff, created "Scream" and is now endorsing "Summer" (Def. Supplemental Mem. at 9 n. 4, "the instant action is not like a false endorsement case because no one is likely to be confused into believing that *Miramax itself* endorses the product" [emphasis original]).

This argument is not persuasive. Having aggressively designed and distributed an international advertising campaign which seeks to persuade consumers that "Summer" and "Scream" originate from the same source, defendants cannot now be heard to argue, especially in light of the survey evidence of confusion, that the advertisements failed because a significant portion of consumers do not associate "Scream" with a particular source.

The central message of defendants' advertisements is that "Summer" is a desirable product because it comes from the same source as "Scream." The fact that the source is not named does not change the analysis. *Cf. Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1221 (2d Cir.1987) (secondary meaning, which determines whether producer has protectible interest in mark, exists when mark identifies source of goods, even if relevant consuming public might not know name of producer). *Accord A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 300 (3d Cir.1986) (recognizing that a term may function as an indicator of source even though consumers may not know the name of the source).

Furthermore, the manner in which courts resolve irreparable harm questions in false advertising and trademark cases reinforces the conclusion that irreparable harm may be

**302**

presumed here. Irreparable harm has been presumed in false advertising cases involving direct competitors. *See Coca–Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 316–17 (2d Cir.1982) (misleading, non-comparative advertisement which makes defendant's product more desirable is presumed to cause irreparable harm to direct competitor); *McNeilab*, 848 F.2d at 38 ("a misleading comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer"). Because there is credible evidence that "Summer" competes at the box office with "Scream" and "Scream 2" (Tr. 219), these cases involving direct competitors are relevant.

Irreparable harm has also been presumed in cases of trademark infringement. *See Church of Scientology Intern. v. Elmira Mission*, 794 F.2d 38, 43–44 (2d Cir.1986) (noting that trademark infringement by former licensee presumptively causes irreparable harm because it removes plaintiff's control over the reputation of its trademark and damages the plaintiff's interest in preserving the quality and vitality of its mark). Even if plaintiff does not have a trademark in "Scream," defendants' advertisements explicitly represent that the source of "Summer" is the source of "Scream," and thus perform the function a trademark would perform—source identification. *See Wallace Intern. Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 78 (2d Cir.1990) ("the core purpose of trademark law is to prevent competitors from copying those aspects of a product ... that identify the source of the product to prospective consumers. By giving the first user of a trademark exclusive rights in that mark, the law protects trademark owners' investments in creating goodwill and affords consumers a low-cost means of identifying the source of goods") (citations omitted), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991).

In sum, the harm to be avoided in this case is of the same type as the harm to be avoided in *King* and *Allen.* The false advertising and trademark cases discussed above provide guidance as well. Plaintiff has an interest in protecting itself from deceptive association with a product it does not control. Addition-

ally, plaintiff has an interest in protecting "Scream" from source confusion. Under all the circumstances of this case, irreparable harm may be presumed.

### Scope of the Injunction

On February 13, 1998, the parties submitted the box office release schedules for "Summer," "Scream," and "Scream 2." Defendants provided two lists (hereafter "the release lists"). The first list specifies territories where "Summer" was in release "as of" February 13, 1998; the second specifies territories where "Summer" will be in release "after" February 13, 1998 (see Brody letter February 13, 1998, at 3–4). Neither party indicates how long the films will remain in box office release.

NOW, upon all prior submissions in this action, it is:

ORDERED, that Columbia Pictures Entertainment, Inc. and Mandalay Entertainment, Inc. immediately direct, in writing, all agents, representatives, successors, assignees, licensees, distributees, and persons or entities to whom any of the above has supplied advertising materials or promotional materials for the film "I Know What You Did Last Summer" in territories appearing on the release lists to remove the "Scream" catchphrases from all advertising materials and promotional materials for the film; and it is further,

ORDERED, that by no later than 12:05 p.m. on March 9, 1998, defendants shall submit to the Court copies of the instructions sent in compliance with the preceding paragraph, and a list containing the name, mailing address, and telephone number of every person or entity throughout the world to whom the instructions were sent; and it is further,

ORDERED, that defendants and their agents, representatives, and successors immediately cease to distribute any advertising materials or promotional materials containing the "Scream" catchphrases.

SO ORDERED.