# ISLAND ONLINE, INC., Plaintiff,

v.

# NETWORK SOLUTIONS, INC. and the National Science Foundation, Defendants.

### No. CIV. 99–CV–6848 (DGT).

United States District Court, E.D. New York.

Nov. 6, 2000.

Daniel C. Marotta, Dowd & Morolta, New York, N.Y., for Island Online, Inc.

Shari Claire Lewis, Rivkin, Radler, & Kremer, Uniondale, N.Y., for Network Solutions, Inc.

Theodore C. Hirt, United States Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, for National Science Foundation.

### MEMORANDUM AND ORDER

TRAGER, District Judge.

█ In October of 1999, plaintiff Island Online ("IOL") brought this suit, styled as a § 1983 action, against defendants Network Solutions, Inc. ("NSI") and the National Science Foundation ("the NSF") for damages, declaratory judgment and injunctive relief arising out of NSI's refusal to register three Internet domain names desired by IOL. IOL contends that NSI's policy of filtering out certain obscene domain names, coupled with NSI's affiliation with the NSF, a government entity, constitutes a violation of IOL's First and Fifth Amendment rights under the United States Constitution and IOL's rights to freedom of speech and due process of law guaranteed by Article 1, § 8 and Article 1, § 6 of the New York State Constitution respectively. NSI now moves for dismissal of IOL's complaint and/or summary judgment, and the NSF has moved for dismissal, or, in the alternative, for a more definite statement.[1] Both defendants argue that, even accepting all of IOL's allegations as fact, IOL has no standing to bring suit, and NSI is not a state actor and, consequently, cannot be liable for alleged violations of IOL's constitutional rights. IOL opposes summary judgment and has made a cross-motion to amend its complaint to assert a cause of action under

---

1. To the extent that the defendants rely on matters outside the scope of the pleadings, both motions will be treated as motions for summary judgment. *See generally* Fed. R.Civ.P. 12(b) (providing that a court may dispose of Rule 12(b)(6) motions under Rule 56 under certain circumstances).

*Bivens* and to add individual employees of NSI and the NSF as defendants. NSI and the NSF oppose the motion to amend, maintaining that any amendment would be futile.

## Background

### (1)

### The Internet and the Cooperative Agreement

The "Internet" is a worldwide system of computer networks and individual computers that are interconnected by communications facilities. *See* Decl. George Strawn ¶ 4 [hereinafter "Strawn Decl."]. The antecedents of the Internet were systems for two relatively small groups of research-oriented governmental, academic and corporate entities—ARPANET and NSFNET. *See id.* ¶ 5. ARPANET received its principal support from the Department of Defense and related agencies, while NSFNET's support came from numerous sources, including the NSF and other federal agencies, academic institutions and corporate sponsors. *See id.*

Under a system first implemented on the ARPANET, each entity connected to the Internet is assigned one or more unique numeric "addresses" which permit other connected entities to send it communications. *See id.* ¶ 11. These addresses, known as "IP addresses," are similar in function to telephone numbers and are written as a series of no more than 12 digits separated by periods (e.g. "204.146.46.8"). *See id.* During the early days of the Internet, IP addresses were maintained and assigned by one individual, Dr. Jon Postel at the University of Southern California's Information Sciences Institute, who performed this task as part of the ARPANET experiment. *See id.* ¶ 12. Later, Dr. Postel's project came to be known as the Internet Assigned Numbers Authority ("IANA"). *See id.* The

IANA oversaw the allocation of IP addresses until November 1998, when the Internet Corporation for Assigned Names and Numbers ("ICANN"), a private, non-profit corporation, was formed and designated as the governing body responsible for IP address space allocation, as well as other Internet-maintenance responsibilities. *See id.*

Because IP addresses could be difficult to remember, network users informally assigned alphabetic names to their own computers, and these names were tracked and associated with their corresponding IP numbers in a file maintained by Dr. Postel and downloaded to the host computers at all Internet sites. *See id.* ¶ 13. In 1987, this practice evolved into what is known as the Domain Name System ("DNS") for associating names with IP numbers on the Internet. *See id.* ¶ 14. The DNS makes it possible for users to address messages to other users and to Internet-attached computers by name rather than number. *See id.* ¶ 15.

The sequences of alphanumeric characters that make up domain names are segmented by periods (e.g., "ibm.com" or "nsf.gov"). *See id.* ¶ 16. The segments are hierarchically related to one another. *See id.* The far right segment is called the top level domain ("TLD"), the next is called the second level domain ("SLD"), and so on. *See id.* In the above examples, ".com" and ".gov" are TLDs; "ibm" and "nsf" are SLDs. *See id.* Each domain name must be unique; it is impossible for more than one entity to register for any given domain name. *See id.* ¶ 21.

Whereas TLDs are generic, SLD names are typically expressive of the content and interfaces that one would expect to find on the particular site designated by the domain name. *See* Pl. Island Online, Inc.'s Opp. Mem.[2] at 3 [hereinafter Pl.'s Opp. Mem.]. They are marketing tools designed to appeal to the public at large and a key

---

2. Pl's Island Online, Inc.'s Mem. Law Opp. Def. Network Solutions, Inc.'s Mot. Dismiss and/or Summ. J. and Def.'s National Science Foundation's Mot. Dismiss, or in the Alternative for More Definite Statement, and in Supp. Pl's Cross-mot. Am. Compl.

marketing strategy for many new businesses. *See id.* Many businesses now even trademark their "dot.com" names and use those names to express a message to consumers and to the public. *See id.* The TLD ".com" in particular is intended for use by private, commercial businesses such as IOL. *See id.* at 2.

Since the need for DNS name resolution (conversion of domain names into IP numbers) is constant, it is necessary to maintain and update the DNS database continuously. *See* Strawn Decl. ¶ 22. The new domain name information is obtained and disseminated through a process called DNS registration. *See id.* An Internet user who wishes to register a domain name first obtains an IP address to be associated with the desired domain name from an Internet Service Provider or from an IP address registry. *See id.* If the desired domain name has not already been registered in the TLD of the user's choice, it can generally be registered on a first-come, first-served basis. *See id.*

The TLD zone files are replicated at 13 different locations (including NSI) known as the "root server system," but the master root server is maintained by NSI in Herndon, Virginia, pursuant to the Cooperative Agreement detailed below. *See id.* ¶¶ 24–25. The other 12 root servers obtain the daily updated domain name information by copying from the master root server. *See id.* ¶ 25. These other root server operators have no contractual or other legal relationship with the master root server. *See id.* Rather, they have a purely voluntary association with it because of their common interests in a universally resolvable DNS. *See id.*

On January 1, 1993, NSI and the NSF, an agency of the United States Government, entered into Cooperative Agreement No. NCR–9218742 (the "Cooperative Agreement" or "Agreement"). *See id.* ¶ 26. Pursuant to the terms of that Agreement, NSI undertook the task of registering SLD names within the generic TLDs of ".com," ".org," ".net," ".edu" and

".gov." *See id.* ¶ 27. The NSF's role was not to regulate the administration of the Internet but to provide support for domain name registration. *See id.* ¶ 28. The NSF engaged in general oversight of NSI's performance of its responsibilities under the Agreement but not NSI's day-to-day managerial activities. *See id.* Specifically, the Agreement includes the following provisions:

[NSI] has primary responsibility for ensuring the quality, timeliness and effective management of the registration services provided under this [A]greement. To the extent that NSF does not reserve specific responsibility for accomplishing the purposes of this Agreement, by either special condition or general condition of this Agreement, all such responsibilities remain with [NSI]. . . .

NSF has responsibility for registration services support, support planning, oversight, monitoring, and evaluation. NSF will make approvals required under the General Conditions and, where necessary and appropriate, NSF will contact and negotiate with Federal agencies and other national and International [sic] members of the Internet community to further the efforts of this project.

App. Exs. Supp. Mot. Dismiss by Def. Network Solutions, Inc., Ex. G at 7. In September, 1998, responsibility for the Agreement was transferred to the National Telecommunications & Information Administration ("NTIA") of the Department of Commerce. *See* Strawn Decl. ¶ 30. NTIA is now the federal agency that oversees the administration of the Cooperative Agreement, which was due to expire on September 30, 2000. *See id.* ¶¶ 29–30.

In November 1998, in response to President Clinton's initiative to increase competition in and promote international participation in the DNS, NTIA entered into a Memorandum of Understanding with ICANN to collaborate on the design, development and implementation of the mechanisms that need to be in place to

privatize management of the DNS. *See id.* ¶ 31. Under the Memorandum of Understanding, ICANN also undertook the responsibility of working with the Department of Commerce to establish the rules for and accrediting of competing registrars to use NSI's Shared Registration System ("SRS") to register domain names in ".com," ".net," and ".org" domains. *See id.* ¶ 32. Through the SRS, there is no limit on the number of registrars that may register domain names. *See id.*

On April 21, 1999, ICANN introduced this competition by naming five entities which would compete with NSI in the registration of domain names. *See id.* ¶ 33. As of March 16, 2000, NSI was already only one of approximately 35 competitive SLD name registrars (soon to be over 100). *See* Decl. David M. Graves Supp. Mot. by Network Solutions, Inc. ¶ 17 [hereinafter Graves Decl.].

### (2)

### NSI's Registration Process and the Obscenity Policy

NSI is a profit-making Delaware corporation with its principal place of business in Virginia. *See id.* ¶ 2. NSI's board of directors and executive officers do not include, nor have they ever included any members of the NSF or any other governmental agency. *See id.* ¶ 3. Nor does the NSF have the right to appoint, approve or confirm any of the directors or officers of NSI. *See id.*

In 1992, NSI responded to a solicitation issued by the NSF for one or more privately-owned and operated "Network Information Service Managers." *See id.* ¶ 4. As a result, the company won a competitively-awarded Cooperative Agreement to provide, among other things, SLD name registration services in the Internet TLDs of .com, .org, .net, .edu and .gov.[3] *See id.* In connection with these domain name reg-

istration services, NSI enters into private, commercial contracts with registrants of domain names. *See id.* ¶ 6.

During the initial period of performance under the Cooperative Agreement, NSI received funding from the U.S. government. Beginning September 14, 1995, however, the government funding was replaced with fees, charged to the customers for the provision of registration services, and NSI does not now receive any funding or subsidies for its domain name registration from the federal government. *See id.* ¶ 8. NSI presently charges registrants an initial two-year registration fee of $70 and a subsequent one-year registration fee of $35. *See id.* ¶ 7. No portion of this fee is presently shared with the NSF or any other agent of the federal government, *see id.*, nor has any federal or state government ever acted as either a registry or a registrar of domain names in the .com, .org, .net and .edu TLDs. *See id.* ¶ 18.

As a registrar, NSI accepts applications for new SLD names and generally registers them on a first-come, first-served basis. *See id.* ¶ 19. If a domain name registration agreement should expire for any reason, such as the registrant's failure to pay for the registration or failure to re-register under the terms of the agreement, NSI deletes the domain name and cancels the contract, at which point the next applicant who creates and applies for the name becomes the new domain name registrant. *See id.* ¶ 19. Currently, new SLD names are registered with NSI at a rate of over 500,000 a month, a new one every five seconds, and NSI has registered eight million SLD names to date. *See id.* ¶ 20.

As dictated by the volume of registrations, the registration process is completely automated, taking a matter of minutes by computer without any action by anyone other than the prospective registrant. *See*

---

**3.** Prior to 1992, Government Services, Inc., another private company, had been performing these registration functions pursuant to a government contract with the U.S. Government. *See id.* ¶ 5.

*id.* ¶ 22. Since the registration process is fully computerized, NSI generally has no knowledge of individual registrations, including the circumstances surrounding the registration or even that a particular domain name has been registered. *See id.* ¶ 22. Likewise, NSI has no information as to the particular use made of a domain name, and it is entirely in the discretion of the registrant whether the domain name is associated with a web site, E-mail, etc. or just reserved for later use. *See id.* ¶ 23.

While the registration of domain names is done automatically, NSI restricts the registration of domain names that contain six of the seven obscenities similarly prohibited for broadcast by the FCC and major television networks. *See* id. ¶ 31. This practice is implemented through an automaticallytriggered filter in the domain name registration process. *See id.* ¶ 34. The filer blocks the registration of SLD names containing the exact letter strings contained in the restricted words. *See id.*

NSI implemented this policy as a corporate business decision in the summer of 1996. *See id.* ¶ 32. Although NSI offered no further explanation of what specific "corporate business" considerations led them to adopt the policy, NSI's vice-president, General Counsel for the NSF and the NSF's program official responsible for oversight of the Cooperative Agreement with NSI all declare that the NSF had no involvement with the formulation and implementation of NSI's obscenity policy beyond knowing of its existence. *See id.* ¶ 32, Decl. of Lawrence Rudolph ¶ 3, Decl. of Donald Mitchell ¶¶ 3–4.

Because NSI's policy was not adopted until mid–1996, approximately 42 domain names had been previously registered which contained the restricted words. *See* Graves Decl. ¶ 35. NSI did not cancel or otherwise breach the registration contracts with those domain name registrants but rather allowed them to continue. *See id.* However, as these registrations expired or were canceled by the registrants, NSI has declined to register them to a new regis-

trant. *See id.* There are approximately 23 such SLD names remaining in the master database which were registered by NSI. *See id.* In addition, because NSI's policy has not always been error-free, at times, prospective registrants have been able to obtain an otherwise "filtered" domain name despite the "filter." *See id.* ¶ 37. When NSI has been made aware of these violations of its practice within a reasonable time after the registration, the offending registrations have been deleted. *See id.* At the present time, a significant number of the registrars that appeared in the wake of ICANN's introduction of competing registrars on April 21, 1999 do permit registration of the character strings restricted by NSI. *See id.* ¶ 36.

### (3)

### NSI's Rejection of IOL's Domain Names

IOL, a New York corporation headquartered in Richmond County in the Borough of Staten Island, is in the business of providing adult content to consumers on websites on the Internet. Pl's Opp. Mem. at 1–2. Like most Internet companies, IOL uses the development of websites and the registration of domain names to increase its outreach to the public. *See id.* at 2.

On or around April 3, 1999, IOL attempted to register the following domain names: "fuckme.com," "fuckyou.com," and "cocksuckers.com." *See id.* at 3. At this time, NSI was still the sole registrar of SLD names for non-governmental individuals and businesses such as IOL. *See* Decl. of Nicole Watts ¶ 5. Before April, 1999, there had been 15 prior attempts by unrelated third parties to register the domain name "fuckme.com," 15 prior attempts by unrelated third parties to register the domain name "fuckyou.com" and 14 prior attempts by unrelated third parties to register the domain name "cocksuckers.com." *See* Graves Decl. ¶¶ 40–43. Pursuant to NSI's policy of registering domain names

on a first-come, first-served basis, the domain names would have been registered to any of these earlier applicants prior to plaintiff's applications if NSI had not exercised the obscenity policy that is the subject of this litigation. *See id.* ¶ 44.

In order to register a domain name, Nicole Watts, the Chief Operating Officer of IOL, would follow the same procedure each time: she would log on to the NSI Internet website located at www.network-solutions.com, type in the domain name she sought to register as prompted by the instructions and, if that domain name was not already registered to another entity, execute the on-line "Network Solutions Domain Name Registration Agreement" and send this agreement via e-mail to NSI. *See id.* ¶ 6. On or around April 5, 1999, Watts sent checks on behalf of IOL to NSI via Federal Express in payment for each of the domain names she had sought to register. *See id.* ¶ 9. On or around April 8, 1999, each of the checks dated April 5, 1999 was debited from IOL's checking account. *See id.* ¶ 12.

On or around April 14, 1999, NSI notified IOL via e-mail correspondences that NSI had declined to register each of the three domain names that are the subject of this litigation. *See id.* ¶ 13. Each e-mail offered the following paragraphs as an explanation for such denials:

> Network Solutions has a right founded in the First Amendment to the Constitution to refuse to register, and thereby publish, on the Internet registry of domain names words that it deems to be inappropriate.

> Additionally, Network Solutions' outside counsel has advised us that the Supreme Court of the United States has held that no corporation can be compelled to engage in publication which that corporation finds to be inappropriate.

*See id.* After contacting NSI, Watts secured credits for IOL's cashed checks several weeks after having sent them to NSI. *See id.* ¶ 17. IOL contacted NSI numerous times via e-mail to request an explanation as to why NSI determined the Domain Names to be "inappropriate" but received no further elucidation. *See id.* ¶¶ 18–19.

On October 22, 1999, IOL brought suit against NSI and NSF, alleging numerous violations of the United States Constitution and the New York State Constitution and seeking damages, as well as a declaration that NSI's obscenity policy is unconstitutional and injunctive relief awarding the contested domain names to IOL. At the present time, the contested domain names have been registered to third parties unrelated to the litigation through registrars other than NSI that do not have a policy of filtering out the obscenities that appear in the contested domain names. *See* Graves Decl. ¶¶ 46–48.

## Discussion

### (1)

### Standing

■ NSI and the NSF contend that IOL has no standing to bring its claims for relief. In order to have standing to sue in Federal Court, a plaintiff must demonstrate three contingencies:

1. that it has suffered an actual injury to a protected interest that is neither hypothetical nor speculative ("the injury-in-fact requirement")

2. that there is a causal connection between the injury and the conduct complained of, so that the injury may be said to be "fairly traceable" to the challenged action of the defendant ("the causation requirement")

3. that it is "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision" ("the redressability requirement").

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

The injury-in-fact requirement is not difficult to meet here. The Supreme Court

has said that when the plaintiff itself is an object of an action or inaction at issue, there is "ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 564, 112 S.Ct. at 2138. Here, IOL's applications for domain names were directly denied as a result of NSI's obscenity policy, and IOL's fiscal interest was harmed thereby.

The causation and redressability requirements present something of an imbroglio, however. If it is indeed the case—and it is—that 14 or 15 applicants attempted to register each of the contested domain names prior to IOL, and if each of these prospective applicants was refused the names—and they were—as a consequence of NSI's obscenity policy, then had NSI not had an obscenity policy, each of the names would have been registered to the first prospective applicant pursuant to NSI's independent and constitutionally-unchallenged first-come, first-served policy. Therefore, it might be said—as NSI and the NSF insist—that plaintiff IOL was not harmed at all by the challenged obscenity policy—that is, even absent the policy, the names would have already been assigned to another entity. It is at this point that IOL's damages claims, IOL's claim for injunctive relief and IOL's claim for declaratory relief must be viewed separately.

On the issue of damages, the existence of earlier rejected applicants seems to pose a problem for IOL. If IOL's suit were allowed to go forward, this would implicitly allow similar suits by subsequently rejected applicants, if any, as well as by any previously rejected applicants whose claims were not already barred by the relevant statute of limitations. Thus, while no more than one applicant could have gotten the domain names in question,

an entire battalion of rejected applicants, if successful, could receive compensatory damages aimed to put them put them back in a position all but one of them would never have been in in the first place. NSI would potentially have to pay a theoretically endless series of judgments to every plaintiff to emerge out of the woodwork for an injury that only a single party could have actually sustained. It stands to reason, therefore, that only the first unconstitutionally rejected applicant whose claim remains unbarred by the statute of limitations should be able to pursue a compensatory damages remedy.

The defendants' causation and redressability arguments, however, would suggest that only the very first rejected applicant should be able to bring suit, statute of limitations notwithstanding. In other words, even if the statute of limitations had already run on the first rejected applicant, no subsequent applicant should be able to sue for damages because no such applicant could show that the allegedly unconstitutional policy was a but-for cause of its injuries. However, this argument fails to reflect the notion that "the principle enforced in statutes of limitations" is that "neglect to sue within a specified time [is] conclusive evidence of the abandonment of a cause of action." *Gilfillan v. Union Canal Co. of PA.*, 109 U.S. 401, 404, 3 S.Ct. 304, 306, 27 L.Ed. 977 (1883). Thus, a party who allows the statutory period to elapse without taking action has effectively abandoned any claim to the domain name that he or she might have had, and it is only equitable, then, to view the first-in-time rejected applicant whose claim still falls within the statutory period as having a right to the domain name but for the existence of the allegedly unconstitutional policy.[4]

---

4. Such a view admittedly invites discussion of all sorts of theoretical niceties. It might be supposed, for example, that two parties apply and are rejected for the same domain names within hours or days of each other. Is the second party really expected to wait until the running of the statute of limitations on his predecessor's cause of action, at which point he will become the new first-in-time, non-time barred applicant with a narrow window of opportunity to file an action before his own statutory period runs out? Additionally, be-

On the record before us, although we know that there have been a good number of previous applicants for the domain names in question, we cannot say with certainty that any of these applicants have potential claims that either are or are not time-barred. It is, therefore, impossible to ascertain whether IOL's compensatory damages claim is a first-in-time claim. Consequently, it is uncertain whether or not IOL has standing to sue NSI and the NSF for compensatory damages.[5]

■ This line of inquiry becomes tangential, however, because IOL has standing to pursue nominal damages. In *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Supreme Court ruled that although claims for compensatory damages brought under § 1983 must be supported with proof of actual injury, *see id.* at 254–56, 98 S.Ct. at 1047–48, "deprivations of certain 'absolute' rights" are actionable for nominal damages "without proof of actual injury." By making such deprivations actionable, "the law recognizes the importance to organized society

that those rights be scrupulously observed." *Id.* at 266, 98 S.Ct. at 1054.

*Carey* itself involved a suit for damages by elementary and secondary school students who claimed that they had been suspended from school without procedural due process. *See id.* at 248, 98 S.Ct. at 1044. The plaintiffs introduced no evidence to prove damages; moreover, no finding was made in the district court as to whether they would have been suspended even if they had been afforded procedural due process. *See id.* at 252, 98 S.Ct. at 1046. In other words, there was no proof that the plaintiffs would not have been suspended but for the failure of the defendants to guarantee plaintiffs procedural due process. Regardless, the Court found that the plaintiffs would be entitled to nominal damages even in the absence of direct proof of injury stemming from the alleged unconstitutional conduct.

The principle that *Carey* stands for is not limited to procedural due process and has been applied in the First Amendment context by the Second Circuit. *See e.g. Irish Lesbian, Gay Org. v. Giuliani,*

cause § 1983 actions do not have their own inherent statute of limitations, but rather, require federal courts to borrow personal injury statutes of limitations from the state where the injury occurred, *see Wilson v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 1947, 85 L.Ed.2d 254 (1985), each plaintiff could potentially have its claim governed by a different statute of limitations. Is each plaintiff, then, expected to keep abreast of the particular limitations schedules governing its various counterparts? This and a host of other potentially intriguing scenarios will not be resolved here, in large part because IOL cannot prove that NSI is a state actor in any case.

5. It should be noted that although the federal defendant does not press the issue, it is theoretically doubtful that IOL can sue the NSF in this court. Claims for money damages in excess of $10,000 against the federal government must be filed in the U.S. Court of Claims pursuant to the Tucker Act, and a district court has no jurisdiction over such suits. 28 U.S.C. § 1346(a) (1976); *also see, e.g., Sprecher v. Graber,* 716 F.2d 968, 973 (2d Cir.1983) ("Jurisdiction clearly does not lie under the Tucker Act since claims arising under it must be heard in the Court of Claims when the

amount in controversy exceeds $10,000.") In principle, therefore, IOL's damages claims should be transferred to the U.S. Court of Claims since IOL has not indicated that its damages are less than $10,000.

This would leave open only the issue of declaratory relief (IOL's claim for injunctive relief having been withdrawn), but declaratory relief, directed against the NSF, would pose standing problems for IOL, since IOL cannot show that its injury is fairly traceable to the NSF, the latter having had no discernible role in devising or enforcing NSI's allegedly unconstitutional policy, as will be explained at length in the state action discussion that follows. In addition, IOL's declaratory relief claim has become moot, as will also be made apparent below.

Given that the Court of Claims would have to dismiss IOL's damages claims for a lack of state action and given that IOL's remaining declaratory relief claim would be dismissed in this court for the above-stated reasons, it would be a waste of judicial resources to transfer the damages claims to the U.S. Court of Claims. We will, therefore, dispose of all claims here.

143 F.3d 638, 651 (2d Cir.1998); *Bernheim v. Litt,* 79 F.3d 318, 326 (2nd Cir. 1996); *Davis v. Village Park II Realty Co.,* 578 F.2d 461, 463 (2d Cir.1978). In *Davis,* a case in which plaintiff claimed that a project manager and his employee had attempted to terminate her lease in retaliation for her activities on behalf of a tenants' association, thereby chilling her speech, the court explicitly made the transition from procedural due process to the First Amendment. After explaining the then-recent *Carey* decision, the court went on to say: "Certainly, the rights to freedom of expression and association are no less important to organized society than the right to procedural due process." *Davis,* 578 F.2d at 463. "If the wrong complained of is a mere technical violation of the plaintiff's constitutional rights and she is unable to prove actual damage, she would nonetheless be entitled to a recovery of nominal damages." *Id.*

In *Irish Lesbian and Gay Org.,* the Second Circuit made it clear that a party can get standing without proving that a defendant's unconstitutional conduct caused any actual damage to it. The Irish Lesbian and Gay Organization ["ILGO"] had sued the mayor of New York City under § 1983 for violating its free speech and equal protection rights by denying its application to conduct a parade before the annual St. Patrick's Day parade. *See Irish Lesbian and Gay Org.,* 143 F.3d at 643. In this context, the court wrote that "ILGO has standing to assert a claim for nominal damages. Nominal damages are available in actions alleging a violation of constitutionally protected rights, even without proof of any actual injury." *Id.* at 651 (citing *Carey v. Piphus*). In fact, nominal damages are available to the plaintiff even without having made an explicit demand for them, so long as the claim demands compensatory damages. *See id.*

This is the very situation we are confronted by in the case at bar. IOL can assert unconstitutional conduct on the part of NSI. It can also assert injury, namely the failure to secure its desired domain names. What it has trouble maintaining is that this injury is a result of NSI's allegedly unconstitutional policy. But, as the Second Circuit has clearly established, IOL need only assert a constitutional violation of its rights in order to gain standing, at least standing to seek nominal damages. Just as the plaintiffs in *Carey* did not have to demonstrate that they would have not been suspended but for the procedural due process violation in that case, IOL need not make the allegation that but for its First Amendment rights being violated, it would have obtained its desired domain names. It need only allege that its First Amendment rights were violated. Therefore, IOL does have standing insofar as it can pursue nominal damages.

The situation is slightly distinct in the injunctive relief scenario. To begin with, the problem that arises when more than one party demands the issuance of an injunction awarding it the right to the same contested domain names is even more obvious than the analogous dilemma that surfaces in a suit for compensatory damages. One solution would be to allow only the first unconstitutionally rejected applicant whose suit is not time-barred to bring suit, just as was suggested in the damages context. But what should a court do if that rejected applicant does not wish to bring suit at all? It would seem wasteful to allow commercially useful and desirable domain names to sit idle despite the existence of applicants eager to claim them, all because a first-in-time applicant whose suit is not time-barred does not wish to pursue his rights, a very plausible scenario considering the ease with which a would-be-applicant can simply choose to pursue different domain names instead of undertaking the expense and uncertainty of litigation.

Fortunately, the equitable doctrine of laches is available to a party who pursues injunctive relief only to find himself defending against a claim of precedence by a

previously laggard first-in-time applicant. Laches, which must be pled as an affirmative defense pursuant to F.R.C.P. 8(c), is an equitable doctrine that allows a party to oppose a would-be claim against it, even if that claim might be substantively legitimate, on the basis that the claimant in question displayed an unreasonable lack of diligence in pursuing his rights and where delay prejudices, in some way, the rights of the party otherwise subject to suit. *See King v. Innovation Books,* 976 F.2d 824, 832 (2d Cir.1992); *Southside Fair Hous. Comm. v. City of N.Y.,* 928 F.2d 1336, 1354 (2d Cir.1991). Prejudice may be shown either because of an inequity in allowing a claimant to proceed in light of a change in the defendant's position or because delay makes it difficult for the defendant to obtain necessary evidence. *See Robins Island Preservation Fund, Inc. v. Southold Dev. Corp.,* 959 F.2d 409, 424 (2d Cir.1992). Laches can be invoked to bar constitutional claims. *Southside Fair Hous. Comm.,* 928 F.2d at 1354. The inquiry focuses on the reasonableness of the delay rather than on the amount of time that passes. *See Stone v. Williams,* 873 F.2d 620, 624 (2d Cir.1989), *vacated on rehearing by* 891 F.2d 401 (2d Cir.1989). Given this framework, it seems reasonably apparent that a party that pursued and secured injunctive relief, obtained a desired domain name and began to devote significant resources to developing content for his newly obtained website could go far toward making out the elements of a laches defense against a claimant who comes along much later and claims to have had a prior right to the use of that domain name despite having taken no action upon initially receiving his rejection nor upon the filing and coming to

judgment of the lawsuit by the domain name's current holder.

Thus, in the injunction context, while as a general matter only a non-time-barred, first-in-time, unconstitutionally rejected applicant can sue for injunctive relief, where such an applicant's inactivity becomes apparent, a court, cognizant of the viability of a laches defense in any given situation, might consider allowing suits by later applicants. The injunctive relief issue will not be definitively resolved simply because IOL has withdrawn its demand for injunctive relief. "Plaintiff does not seek injunctive relief, until such time as such relief may become feasible."[6] Pl.'s Opp. Mem. at 6. But whether or not IOL would be able to obtain injunctive relief as a practical matter—that is, whether or not now was the appropriate time for IOL to have brought its injunctive relief claim— does not alter the underlying determination that IOL has standing to bring suit.

■ Finally, we turn to the case of declaratory relief, where the situation is markedly different. Once again, the two defendants would argue that IOL's suit is barred by its inability to show that, but for NSI's allegedly unconstitutional policy, IOL would have obtained the domain names. But when it comes to declaratory relief, the unworkability of this ostensibly sensible suggestion is exposed upon further reflection, for it implicitly posits a constitutional regime where only the first applicant for any contested domain name would have standing to sue NSI for its injuries. All subsequent applicants, IOL included, would be barred because they were not entitled to the domain names in

6. Were such relief sought, it would necessitate structuring an order that: (1) would be made contingent upon the highly unlikely possibility that one of the registrants to whom the contested domain names currently belong would allow a domain name to lapse instead of re-registering it after the expiration of the two-year registration term; (2) would force NSI to register those lapsed names to IOL in lieu of all of the prior applicants and any subsequent applicants for the names; and (3) would freeze the lapsed names so that none of NSI's current competitors could register them to unrelated third parties before NSI had the opportunity to register them to IOL. Such an injunction would be binding upon indispensable third parties that have not been joined by IOL. For that reason, IOL appears to recognize in its proposed amended complaint that such relief is, at least for the time being, impracticable. *See* Notice Cross-mot. Leave Amend. Compl. ¶ 5.

the first place. And if the first claimant, perchance, failed to bring its claim, whether by virtue of ignorance, sloth, an unlitigious nature or the running of the applicable statute of limitations, an ongoing potential constitutional violation could forever go unremedied.

While this scenario does not appear overly ominous in this instance (the obscenity policy covers a theoretically infinite gamut of domain names and sooner or later, a first-in-time prospective registrant would take legal action), one need only consider a close permutation on the present fact pattern to see the full implications of this standing argument in all its invidious glory. If a state agency were to deny, on the basis of race, twenty applications for access to the same limited fund sufficient to cover only the first three successful applicants, and if the first three applicants victimized by discrimination failed to bring suit, then all of the remaining applicants whose applications were impermissibly denied and all the applicants-to-be whose applications will be impermissibly denied in the future could do no more than grind their teeth in the face of a constitutional violation. Surely, this is an unacceptable proposition, and the Supreme Court has said as much in the equal protection context:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.

*Northeastern Fla. Ch. of the Associated Gen. Contr. of Am. v. City of Jacksonville, Fla.,* 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993).

The defendants, however, cite the Seventh Circuit decision in *Harp Adver. Ill., Inc. v. Village of Chicago Ridge,* 9 F.3d 1290 (7th Cir.1993), for the proposition that this equal protection logic should stay confined to the equal protection context. Discussing *Northeastern Fla.,* the *Harp Advertising* court notes that in that case "[k]nowledge that there was an injury, coupled with inability to identify the victim—an inability attributable to the law being challenged—made it appropriate to recharacterize the injury as a denial of the opportunity to compete." *Harp Advertising,* 9 F.3d at 1292. The *Harp Advertising* court then proceeds to explain that such a recharacterization is inappropriate given a set of facts where a plaintiff was unable to erect a billboard due to constitutionally-challenged sign and zoning codes and, due independently, to an unchallenged village ordinance that prohibited billboards exceeding 200 square feet. *See id.* at 1291. The plaintiff's billboard measured 20 by 60 feet. *See id.* The court wrote: "This litigation is irrelevant. There might be a point to the case if Harp wanted to post a smaller sign.... But Harp did not make such a representation...." *See id.*

The court then proceeded to distinguish the facts of *Harp Advertising* from the traditional First Amendment overbreadth challenge cases. *See, e.g., Forsyth County v. Nationalist Movement,* 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); *Virginia v. Amer. Booksellers Ass'n,* 484 U.S. 383, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). In those cases, the court argued, litigants making facial challenges do obtain a concrete benefit from victory in their lawsuits, namely the striking down of a statute standing in the way of additional speech, even if it is true that the government can often proceed to enact a narrower statute that "snatches away the victory." *Id.* at 1292. But the plaintiff in *Harp Advertising* "has no similar prospect of gain." *Id.* "An injunction against the portions of the sign and zoning codes that it has challenged would not let it erect the proposed sign; the village could block the sign simply by enforcing another, valid, ordinance already on the books." *Id.*

Superficially, then, it would appear that *Harp Advertising* addresses itself specifically to a category of cases within which the case at bar falls. However, there is one important difference between this case and *Harp Advertising*. There, a plaintiff wishing to express his desired content and challenge the provisions of the zoning and sign codes perceived to be unconstitutional need only reduce the size of his billboard. But here, there is nothing IOL can do to become the first-in-time applicant for its domain names. If IOL wishes to speak, it must express itself differently.

Now, granted, speaking differently may not be such a great burden in this case, and if IOL were truly bent on having NSI's obscenity policy declared unconstitutional, it need only attempt to register an obscene domain name for which there have been no prior applicants, a task that is easy enough, given the virtually infinite supply of characters at its disposal.[7] But it is sufficient to revisit the limited fund hypothetical discussed above and alter it from a case of racial discrimination to a case of impermissible viewpoint discrimination to see the category of cases into which this one truly falls. In such a case, a plaintiff cannot easily find a way to vindicate his rights.

The true distinction between *Harp Advertising* and this case, then, is that while in *Harp Advertising* the obstacle to suit involves a mere matter of failing to conform one's proposed conduct to the parameters of an established regulatory scheme, the obstacle to suit here and in the limited fund hypothetical is one that, by its very terms, serves to limit the pool of would-be-litigants and consequently insulates a potential wrongdoer from suit. In short, we are confronted here with a situation that fits much more neatly into the rubric established by the Court in the equal protection context of *Northeastern Fl.* than into the standing doctrine as envisioned by the Seventh Circuit in the superficially-similar First Amendment context of *Harp Advertising*.

Moreover, as has already been noted above, the Supreme Court has allowed standing to seek nominal damages without proof of injury as long as the litigant can establish that his rights have been violated. Further, the underlying reason behind that line of cases is "the importance to organized society that ... rights be scrupulously observed." *See Carey*, 435 U.S. at 266, 98 S.Ct. 1042. Given this ambition, it would be absurd if courts could not, in identical circumstances, adjudicate claims for declaratory relief, and indeed, the Supreme Court in *Carey* and the Second Circuit in *Irish Lesbian and Gay Org.* both entertained claims for declaratory relief despite a lack of evidence to show that the constitutional violations in question caused the respective parties any injury. The conclusion, therefore, is that IOL has standing to sue for declaratory relief.[8]

■ At the present time, however, IOL cannot bring such a suit. Other parties currently possess the contested domain names. Furthermore, other registrars currently exist and operate without anything like NSI's obscenity policy. Each of

---

7. It would not be very difficult for IOL to embed a profanity within a string of completely random characters, thereby creating a domain name that no one has yet applied for which would be screened out by NSI's obscenity policy.

8. The benefit IOL would have obtained from such a suit—had it been brought before the domain names were registered to other applicants—is, at the very least, the opportunity to meaningfully apply for its desired domain names and, more likely, the domain names

themselves. The latter benefit is not a complete certainty only because it is technically possible for a third party to pounce on the domain names as soon as NSI managed to comply with a court's declaration that its policy is unconstitutional by revising its registration process accordingly. While not a matter of certainty, even this latter benefit falls well within the redressability requirement that it be likely, as opposed to merely speculative, that relief address the underlying injury. *See Lujan, supra*, 561, 112 S.Ct. at 2136.

these factors, taken by itself, constitutes an independent ground for concluding that IOL's claim for declaratory relief is now moot.

A claim becomes moot "when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur," *Irish Lesbian and Gay Organization v. Giuliani*, 143 F.3d 638, 647 (2d. Cir.1998) (citations omitted), or "when it becomes impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury." *Alexander v. Yale University*, 631 F.2d 178, 183 (2d Cir. 1980).

While it is true that NSI continues to maintain its allegedly unconstitutional obscenity policy, at the present time, the continued existence of that policy has no discernible effect on anyone seeking to register domain names containing the obscene words NSI rejects. They can simply register the contested names with other registrar sites.

Nor is this a case that falls into the limited exception to the mootness doctrine that applies only to "exceptional situations," *Muhammad v. City of New York Dept. of Corrections*, 126 F.3d 119, 123 (2d Cir.1997) (citation omitted), and covers those controversies that are "capable of repetition, yet evading review." *Id.* (citation omitted). Unless a class action is involved, the "capable of repetition, yet evading review" exception will not be applied unless "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [i]s a reasonable expectation that the same complaining party would be subjected to the same action again." *Id.*

9. Title 42 U.S.C. § 1983 provides:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

Neither of these circumstances obtain here. The likelihood that the Internet domain name registration process will revert to its state prior to the introduction of multiple registrars or that all currently operating registrars will choose to adopt NSI's obscenity policy is nothing short of infinitesimal. This, in conjunction with the fact that IOL's desired domain names have already been registered to other parties, would make declaratory relief absolutely ineffectual in this case—which is another way of saying that IOL's declaratory relief claim has been rendered moot, but not that IOL lacks standing to bring that claim.

To summarize, IOL has standing to sue for nominal damages and, therefore, has standing in this action. Its standing to sue for compensatory damages is uncertain, as is its standing to sue for injunctive relief, which has not been decided here because IOL has withdrawn its injunctive relief claim. Finally, IOL has standing to sue for declaratory relief, but its claim for declaratory relief is moot at the present time.

### (2)

### State Action

#### a. IOL's § 1983 Claims

■ Plaintiff's claims are framed as a suit under 42 U.S.C. § 1983,[9] and " § 1983, enacted pursuant to the authority of Congress to enforce the Fourteenth Amendment, prohibits interference with federal rights under color of state law." *Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982). In suits brought under § 1983, " 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *Id.*, 102 S.Ct. at 2769–70.

thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

To support its assertion that NSI is a state actor, IOL relies on a bevy of claimed connections between NSI and the NSF, a federal agency. But, as a threshold matter, § 1983 requires action by the state, not by the federal government. *See District of Columbia v. Carter*, 409 U.S. 418, 424–25, 93 S.Ct. 602, 606, 34 L.Ed.2d 613 (1973), *rehearing denied*, 410 U.S. 959, 93 S.Ct. 1411, 35 L.Ed.2d 694 (1973). The proposition that federal actors do not act under color of state law is a well-established one. *See Bordeaux v. Lynch*, 958 F.Supp. 77, 84 (N.D.N.Y.1997); *Robinson v. Overseas Military Sales Corp.*, 827 F.Supp. 915, 925 (E.D.N.Y.1993), *aff'd*, 21 F.3d 502 (2d Cir.1994); *John's Insulation, Inc. v. Siska Const. Co., Inc.*, 774 F.Supp. 156, 161 (S.D.N.Y.1991); *Morpurgo v. Board of Higher Educ. in the City of New York*, 423 F.Supp. 704, 713 n. 18 (S.D.N.Y. 1976); *Soldevila v. Secretary of Agriculture*, 512 F.2d 427, 429 (1st Cir.1975).

*John's Insulation* is particularly instructive here because the plaintiff there, like IOL here, relied on a government contract between a private defendant and a U.S. agency, the Army in that case, in order to assert state action under § 1983. *John's Insulation*, 774 F.Supp. at 158. The Court dismissed the plaintiff's claim because "[a]ctions of the federal government or its officers are exempt from the proscriptions of § 1983." *Id.* at 161.

But IOL, at best, can claim that NSI is a federal actor, and so it is left without a foothold in § 1983. Summary judgment is, therefore, granted with respect to IOL's § 1983 claims, and the inquiry as to all of IOL's federal claims would end here but for IOL's proposed amendment of its complaint to include a *Bivens* action.

**b. IOL's Proposed *Bivens* Claim**

■ *Bivens* actions are typically analyzed under the same methodology as § 1983 claims:

> A *Bivens* action is a nonstatutory counterpart of a suit brought pursuant to 42 U.S.C. Section 1983, and is aimed at federal rather than state officials. By direct analogy to Section 1983, a *Bivens* action has two principal elements: first, a claimant must show he has been deprived of a right secured by the Constitution and the laws of the United States; second, he must show that in depriving him of that right the defendant acted under color of federal law. For this purpose, the statutory "under color of law" requirement is equivalent to the constitutional doctrine of state action. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929–30, 102 S.Ct. 2744, 2749–50, 73 L.Ed.2d 482 (1982). Thus, where there has been no state action, a Bivens claim must fail at the outset.

*Mahoney v. Nat'l. Org. for Women*, 681 F.Supp. 129, 132 (D.Conn.1987) (citations omitted); *see also Bordeaux v. Lynch*, 958 F.Supp. 77, 84 (N.D.N.Y.1997) (dismissing plaintiff's § 1983 claims against federal Drug Enforcement Administration officers and proceeding to analyze whether defendants acted under "color of federal law" under *Bivens*). Because of the analogous state action standards under *Bivens* and § 1983, we can proceed to apply the same state action tests that we would have applied had there been a colorable § 1983 claim.[10]

■ There are four commonly-utilized state action tests:

---

**10.** The Second Circuit has just recently decided that *Bivens* actions can be maintained against private corporations acting under color of federal law. *See Malesko v. Correctional Servs. Corp.*, 229 F.3d 374 (2d Cir.2000). The issue had not previously been addressed by the Second Circuit. Most other circuits have allowed such suits, although, prior to the Second Circuit decision, only the D.C. Circuit focused precisely on the issue of whether private *entities*, in contrast to private parties in general, can be sued under *Bivens* and found that they cannot be so sued. *See Kauffman v. Anglo–Am. Sch. of Sofia*, 28 F.3d 1223 (D.C.Cir.1994); *Schowengerdt v. General Dynamics Corp.*, 823 F.2d 1328, 1337–38 (9th Cir.1987); *Dobyns v. E–Systems, Inc.*, 667 F.2d 1219 (5th Cir.1982); *Yiamouyiannis v. Chemical Abstracts Serv.*, 521 F.2d 1392 (6th Cir.1975).

Courts will find state action despite the presence of a private party in four discernible situations. First, state action exists given a "symbiotic relationship" between the private actor and the state. Second, the "nexus test" finds state action when the state commands or encourages the private discriminatory action. A third situation sufficient to support a finding of state action occurs when a private party carries on a traditional public function. Finally, state action is present when the involvement of governmental authority aggravates or contributes to the unlawful conduct.

*Air Line Pilots Ass'n v. Dep't of Aviation of the City of Chicago*, 45 F.3d 1144, 1149 (7th Cir.1995) (citations omitted). The four tests are not absolutely orthogonal to one another, but among them, they thoroughly cover the relevant jurisprudential territory. Since IOL tacitly invokes all four, the Court will go systematically through each, one by one.

■ The "public function" test is more accurately described as an "exclusive public function" test. *See Rendell–Baker* 457 U.S. at 842, 102 S.Ct. at 2772. It has been "limited strictly, and covers only private actors performing functions 'traditionally the exclusive prerogative of the State.'" *National Broad. Co., Inc. v. Communications Workers of America, AFL–CIO*, 860 F.2d 1022, 1026 (11th Cir.1988) (citations omitted). The Supreme Court stressed the limited nature of the public function test in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), where a customer tried to sue a utility company for termination of her electrical service without prior notice or hearing. *Id.* at 346–348, 95 S.Ct. at 451–452. The company, private though it was, held a certificate of public convenience issued by the Pennsylvania Utility Commission, which empowered it to deliver electricity to a service area wherein the plaintiff resided. *Id.* at 346, 95 S.Ct. at 451. The Court wrote:

[P]etitioner ... urges that state action is present because respondent provides an essential public service required to be supplied on a reasonably continuous basis by [a Pennsylvania state statute], and hence performs a "public function." If we were dealing with the exercise by [respondent] of some power delegated to it by the State which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one.... Doctors, optometrists, lawyers, [respondent], and Nebbia's upstate New York grocery selling a quart of milk are all in regulated businesses, providing arguably essential goods and services, "affected with a public interest." We do not believe that such a status converts their every action, absent more, into that of the State.

*Id.* at 352–54, 95 S.Ct. at 454–55 (citations omitted).

In fact, the range of activities where private actors were found to be performing traditional public functions is prohibitively constricted, including operating a company town, *see Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), a municipal park, *see Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) and an election, *see Nixon v. Condon*, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), as well as providing medical treatment to injured prison inmates, *see West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). No traditional public function was found, however, in cases that involved providing workers' compensation benefits or medical treatment to injured workers, *see American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999), providing nursing home services to Medicaid patients, *see Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534, running a private school, *see Rendell–Baker*, 457 U.S. 830, 102 S.Ct. 2764, or operating a utility company, as in *Jackson* itself. As the Court has said: "The range

of government activities is broad and varied, and the fact that government has engaged in a particular activity does not necessarily mean that an individual entrepreneur or manager of the same kind of undertaking suffers the same constitutional inhibitions." *Evans,* 382 U.S. at 300, 86 S.Ct. at 489.

IOL contends that "[r]egistration of business names, assumed names, and trademarks, and the granting of a property right are functions that are traditionally the role of the States." [11] Pl.'s Opp. Mem. at 20. "NSI is a state actor acting under color of state law because NSI performs a function that is a traditional role of the State—registration of business names." *Id.* IOL's contentions in this regard are unsupported by the record.

Although the U.S. Department of Defense was indeed an instrumental agent in the Internet's origins, the Internet is, by no stretch of the imagination, a traditional and exclusive public function. For most of its history, its growth and development have been nurtured by and realized through private action. *See American Civil Liberties Union v. Reno,* 929 F.Supp. 824, 832 (E.D.Pa.1996), *aff'd,* 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("no single entity—academic, corporate, governmental, or non-profit—administers the Internet."); *also see Cyber Promotions, Inc. v. American Online, Inc.,* 948 F.Supp. 436 (E.D.Pa.1996) ("[n]o single entity, including the State, administers the Internet").

Moreover, registration of Internet domain names, the focal point of this case, has never been a public function at all. As the D.C. Circuit wrote recently,

Congress chose not to require NSF or any other agency of the federal government to register domain names. Simply because NSF might have been able to perform the function does not transform this activity into a government service or thing of value. A recent and novel function such as domain name registration hardly strikes us as a "quintessential" government service, as registrants suppose. Indeed, it was not the government but the Internet Assigned Numbers Authority—headed by the late Dr. Postel at USC . . . that originally maintained host computer name lists.

*Thomas v. Network Solutions, Inc.,* 176 F.3d 500, 511 (D.C.Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000). "[T]he mass scale registration of commercial domain names has never, never been a Government function, ever." App. Exs. Supp. Mot. Dismiss by Def. Network Solutions, Inc., Ex. J. In light of the facts and the relevant case law, IOL's claim that NSI's registration of domain names is an exclusive public function cannot be maintained.

■■■ The "symbiotic relationship" test finds its origins in *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), where a private restauranteur leased space from a state parking authority in a publicly owned building and engaged in racial discrimination in his restaurant. On those facts, the Court held that the state had so far insinuated itself into a position of interdependence with the restaurant that it had become a joint participant in the restauranteur's business enterprise. *Id.,* at 725, 81 S.Ct. at 861. However, the holding of *Burton* was subsequently limited to cases involving leases of public property, *see Jackson,* 419 U.S. at 358, 95 S.Ct. at 457, and "[p]rivately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit of Burton." *Blum,* 457 U.S. at 1011, 102 S.Ct. at 2789. The Supreme Court has also confined the *Burton* fact

---

11. If IOL means to imply, for purposes of grounding a § 1983 suit, that domain name registration is a traditional function of the States qua States, rather than a traditional function of the federal government, such a claim would be utterly unsubstantiated. The States have never as much as participated in the registration of internet domain names.

pattern to cases where the State benefits financially from a private entity's discriminatory conduct. *Rendell–Baker*, 457 U.S. at 843, 102 S.Ct. at 2772. NSI's relationship with the NSF does not come close to satisfying these requirements.

■■■■ The "close nexus" test requires that "the challenged action of the regulated entity ... may be fairly treated as that of the State itself." *Blum*, 457 U.S., at 1004, 102 S.Ct. at 2786. The State must have exercised such "coercive power" or have provided "such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* "Action taken by private entities with the mere approval or acquiescence of the State is not state action." *American Mfrs.*, 526 U.S. at 52, 119 S.Ct. at 986. But the NSF did no more than acquiesce—and very tacitly at that—in the NSI obscenity policy challenged by IOL. Moreover, as soon as the domain name registration field was opened to competition by the government, multiple registrars with no obscenity policy entered the market without a word of protest on the government's part. This state of affairs amounts to a level of involvement that is easily insufficient to meet the Supreme Court's formulation of the close nexus test.

IOL attempts to close the gap by citing decisions holding NSI to be a federal instrumentality immune from antitrust liability under the Sherman Act. *See* Pl.'s Opp. Mem. at 14–15. IOL can offer no authority to support its claim that these decisions, some involving glaringly inapposite fact patterns, are in any way related to the requirements of the close nexus test. Furthermore, the *Jackson* Court has stated explicitly that monopoly status is not dispositive on the close nexus issue:

> It may well be that acts of a heavily regulated utility with at least something of a governmentally protected monopoly will more readily be found to be 'state' acts than will the acts of an entity lacking these characteristics. But the inquiry must be whether there is a sufficient-

ly close nexus between the State and the challenged action of the regulated entity . . . .

*Jackson*, 419 U.S. at 350–51, 95 S.Ct. at 453. Here there is no such nexus, and so the close nexus test remains unsatisfied. Beyond knowing of its existence, the NSF had absolutely no involvement with NSI's obscenity policy.

Finally, a court could find state action when government involvement in some way contributes to or aggravates the private entity's challenged action, as when a state regulation compels or influences the private actor's alleged Constitutional violation. *See Rendell–Baker*, 457 U.S. at 841, 102 S.Ct. at 2771. It is not altogether apparent that this test is wholly independent from the close nexus inquiry, and the Supreme Court has, at times, treated the two as fungible. *See Jackson*, 419 U.S. at 351, 95 S.Ct. at 453. In any event, where, as here, the challenged action is in no way undertaken at the behest of, under the influence of or for the financial benefit of the State, state action will not be found, even if an "extensive" and "detailed" substratum of state regulation is in place. *Rendell–Baker*, 457 U.S. at 841–42, 102 S.Ct. at 2771–72.

Thus, IOL's complaint fails to assert a cognizable basis for finding state action. NSI's obscenity policy is purely private conduct in which the NSF and the relationship between the two entities play no role. Summary judgment for defendants is granted with respect to all of IOL's federal claims.

### c. IOL's Claims Under the New York State Constitution

■■■■ As for the Constitutional claims IOL makes under the New York State Constitution, they are all too easily disposed of on identical grounds. The New York Court of Appeals has "consistently recognized and reaffirmed" that the State Constitution "governs the rights of citizens with respect to their governments and not

the rights of private individuals against private individuals." *SHAD Alliance v. Smith Haven Mall*, 66 N.Y.2d 496, 502, 488 N.E.2d 1211, 1215, 498 N.Y.S.2d 99, 103 (1985); *see also Hudgens v. NLRB*, 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976) *see also People v. Di-Guida*, 152 Ill.2d 104, 178 Ill.Dec. 80, 604 N.E.2d 336, 341 (1992) ("The high court of New York, urged to construe its State constitution's free speech provision more broadly than the first amendment, found instead that both have the same requirement of State action"). Therefore, inasmuch as IOL cannot show state action for purposes of the U.S. Constitution, summary judgment should be granted for NSI and the NSF on IOL's claims arising under the New York State Constitution as well.

### (3)

### IOL's Request for Further Discovery

IOL claims that summary judgment for defendants should not be granted because it needs further discovery to know to what extent NSF "provided, acquiesced, formulated, compelled, directed, or supervised [the obscenity] policy, all of which NSF had the right to do under the Cooperative Agreement." Pl.'s Opp. Mem. at 8. However, as has been noted above, the relevant facts have been conclusively established by the sworn statements of NSI's vice-president, General Counsel for the NSF and the NSF's program official responsible for oversight of the Cooperative Agreement with NSI. In no way did the NSF either encourage or discourage the policy's formulation and implementation. And IOL has offered nothing in the way of facts to lead one to question these affidavits. Moreover, the subsequent introduction of multiple registrars, some without obscenity policies, confirms the NSF's lack of involvement in NSI's rejection of IOL's domain names. Summary judgment is not to be denied when a party fails to come forward with even a shred of evidence that indicates that further inquiry is appropriate. *See Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506, 512 (2d Cir.1989). While the nonmoving party has to have an opportunity to "discover information that is essential to his opposition," *id.* at 511, a court does not have to allow further discovery where there is no indication that such discovery would yield anything fruitful. *See id.* at 512.[12]

### (4)

### IOL's Proposed Amendments

■■■ It remains only to be decided whether IOL should be allowed to amend its complaint to add specific agents of NSI and the NSF in support of IOL's proposed *Bivens* action,[13] the addition of which

---

**12.** This is not a case, by any stretch of the imagination, where a plaintiff has not had the benefit of perusing a wide variety of relevant documents. Both defendants append thick appendices to affidavits that include the Cooperative Agreement in its entirety, NSI's Annual Report and Form 10–K, numerous documents that illuminate the federal government's role in domain name registration and numerous declarations by high-ranking officials in both NSI and the NSF. In addition, in *National A–1 Advertising, Inc. v. Network Solutions, Inc., et. al.*, 2000 WL 1513791 (D.N.H. Sept.28, 2000), another party sued NSI and the NSF for a denial of certain obscene domain names pursuant to NSI's obscenity policy. Despite having had an interest virtually identical to IOL's and the benefit of some discovery, *see* Federal Def.'s Res. to Ct.'s Request for Supplemental Information, Attach. A at 82, the plaintiff was unable to find anything even remotely indicative of state action, and the court found no state action in that case. *See National A–1 Advertising*, 2000 WL 1513791, at *13. While IOL demands discovery on numerous issues, *see generally* Decl. Opp. Def.'s Post Mot. Submission, it has offered this court absolutely nothing to suggest that additional discovery would yield evidence of government involvement in the formulation of NSI's obscenity policy, and while I would have been perfectly willing to grant time for discovery had I been given a credible reason to do so, in the absence of such a reason, IOL request for additional discovery should be denied.

**13.** A *Bivens* action can only be brought against named individuals, not against a fed-

would also be among the desired amendments. These contemplated amendments are futile insofar as, for reasons discussed above, they fail to advance toward, much less leap over, the state action hurdle that stands in IOL's way. Futility of a proposed amendment is an adequate basis for denial of a motion to amend. *Azurite Corp. Ltd. v. Amster & Co.*, 52 F.3d 15 (2d Cir.1995); *see also Health–Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir.1990) ("where ... there is no merit in the proposed amendment, leave to amend should be denied"); *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129 (2d Cir.1993) (where it appears that granting leave to amend is unlikely to be productive, it is not an abuse of discretion to deny leave to amend). Accordingly, IOL's Cross–Motion to Amend the Complaint is denied.

### Conclusion

For the foregoing reasons, NSI and the NSF's motions for summary judgment are granted. IOL's motion for leave to amend the complaint is denied as futile.

**SO ORDERED.**

eral agency. *See Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 484–485, 114 S.Ct. 996,  1005, 127 L.Ed.2d 308 (1994).

on August 28, 2000. Neither party has requested an evidentiary hearing. For the reasons set forth below, Bihari's motion for preliminary injunctive relief is denied.